# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| DARRON B. PARRISH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 3:02-1007 |
| v. | ) | Judge Wiseman / Knowles |
| | ) | |
| JO ANNE BARNHART, | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's "Motion for Judgment on the Pleadings"[1] and Defendant's "Motion for Judgment on the Administrative Record." Docket Entry Nos. 13 and 17.

For the reasons stated below, the undersigned recommends that the Commissioner's decision be REMANDED.

## I. INTRODUCTION

Plaintiff filed his first application for SSI on September 20, 1993, alleging that he had

---

[1]Although Plaintiff submitted a "Motion for Judgment on the Pleadings," the Court will construe it as a "Motion for Judgment on the Administrative Record." Docket Entry No. 13.

1

been disabled since August 15, 1993, due to back problems, leg swelling, and asthma.[2]  Docket

Number 11, Attachment ("TR"), TR 108; 133.  Plaintiff's application was denied initially (*See*

TR 133) and the record does not indicate that Plaintiff requested reconsideration of this

application[3] (TR 133).

       Plaintiff filed new applications for DIB and SSI on August 30, 1994, with a protective

filing date of July 18, 1994, alleging that he had been disabled since July 18, 1994, due to a back

injury in 1990, asthma, swelling of his feet and big toes, and sleep apnea.[4]  TR 108; 133.

Plaintiff's applications were denied initially, (*See* TR 108; 133), and the record does not indicate

that Plaintiff requested reconsideration of these applications.[5]  TR 133.

       Plaintiff filed another set of applications for DIB and SSI on April 3, 1996, alleging that

he has been disabled since July 10, 1993, due to leg and arm cramps, breathing problems from an

old back injury, knee problems, headaches, and high blood pressure.  TR 108; 178-180; 600-601.

Plaintiff's applications were denied initially[6] (TR 108; 133; 602), and Plaintiff did not pursue a

----

[2]This application is not found in the Administrative Record before this Court, but is referenced in the initial Administrative Law Judge ("ALJ") decision and in a Table of Contents that appears to have been compiled prior to the remand of the initial ALJ decision.  TR 108; 133.

[3]This initial disability determination is not found in the Administrative Record before this Court, but is referenced in the initial ALJ decision and in a Table of Contents that appears to have been compiled prior to the remand of the initial ALJ decision.  TR 108; 133.

[4]These applications are not found in the Administrative Record before this Court, but are referenced in the initial ALJ decision and in a Table of Contents that appears to have been compiled prior to the remand of the initial ALJ decision.  TR 108; 133.

[5]These applications are not found in the Administrative Record before this Court, but are referenced in the initial ALJ decision and in a Table of Contents that appears to have been compiled prior to the remand of the initial ALJ decision.  TR 108; 133.

[6]The initial denial of this DIB application is not part of the Administrative Record before this Court, but is referenced in the initial ALJ decision and in a Table of Contents that appears to

2

request for reconsideration within the required 60-day period (TR 108).

Plaintiff filed the instant applications for DIB and SSI on May 7, 1997, alleging that he has been disabled since July 10, 1993, due to an "injury" to his lower back and both legs. TR 109; 181-183; 609-610. Plaintiff's applications were denied both initially[7] (TR 109; 133; 611-612), and upon reconsideration (TR 103-104; 618-619). Plaintiff subsequently requested (TR 153-154) and received (TR 155-158) a hearing. Plaintiff's hearing was conducted on September 10, 1998, by Administrative Law Judge ("ALJ") William Bivins. TR 40. Plaintiff and vocational expert ("VE"), Rebecca Williams, appeared and testified. *Id.* Plaintiff waived his right to representation by an attorney at this hearing. TR 165. The waiver form indicated, however, that Plaintiff did not fully understand the ramifications of waiving his right to representation. *Id.*

On November 20, 1998, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 105-128. Specifically, the ALJ made the following findings of fact:

1. The claimant met the disability insured status requirements of the Social Security Act on July 10, 1993, the date the claimant stated he became unable to work, and has acquired sufficient quarters of coverage to remain insured through at least June 30, 1997, but not thereafter. (20 CFR 404.132).

2. The claimant has not engaged in substantial gainful activity since July 10, 1993, (20 CFR 404.1510, 404.1572, 416.910,

_____

have been compiled prior to the remand of the initial ALJ decision. TR 108; 133.

[7]The initial denial of this DIB application is not part of the Administrative Record before this Court, but is referenced in the initial ALJ decision and in a Table of Contents that appears to have been compiled prior to the remand of the initial ALJ decision. TR 109; 133.

416.972).

3.      The medical evidence establishes that the claimant has the following "severe" medically determinable impairments: status-post patelloplasty in March 1997 and disorders of the muscle, ligament, and fascia.  These medically determinable impairments, when considered in combination, do not meet or equal the clinical criteria of any of the impairments specifically listed in Appendix 1, Subpart P, Regulations No. 4 (20 CFR 404.1525, 404.1526, 416.926, 416.926, and SSR 96-4p).

4.      The claimant's subjective statements concerning his impairments and their impact on his ability to work are not entirely credible (20 CFR 404.1529(c), 416.929(c), and SSR 96-7p).

5.      The claimant has the residual functional capacity to perform the exertional and non-exertional requirements of light work, except for the restrictions of a sit/stand option. (20 CFR 404.1545, 416.945, and SSR 96-8p).

6.      The claimant is unable to perform his past relevant work as described by the claimant as a MDHA laborer #1, lawn care worker, street cleaner/trash collector, shipyard rigger, and dietary aide.  (20 CFR 404.1565(a) and 416.965(a)).

7.      The claimant is currently 36 years old and has a 12th grade education (20 CFR 404.1563, 404.1564, 416.963, and 416.964).

8.      The claimant has not acquired work skills which are transferable to light jobs.  (20 CFR 404.1568(d) and 416.968(d)).

9.      Based on the exertional capacity for light work, and considering the claimant's age, educational background, and work experience, Rule 202.20, Table 2, Appendix 2, Subpart P, Regulations No. 4, directs a conclusion that the claimant is "not disabled".

10.     Although the claimant's additional non-exertional limitations do not allow him to perform the full range of light work, using the above cited rule as a framework for

4

decision making, there are a significant number of jobs which exist in the national economy which the claimant could perform.

11.     The claimant has not been under a "disability" as defined in the Social Security Act, at any time through the date of this decision.

TR 127-128.

On January 19, 1999, Plaintiff timely filed a request for review of the hearing decision. TR 166-167. On June 30, 2000, the Appeals Council issued an order remanding the case to an ALJ for further review. TR 168-170. The basis of the remand, as will be discussed in greater detail below, was that, "The record is unclear regarding the nature and severity of the claimant's mental status functioning." TR 169. The Appeals Council further stated that the ALJ's decision did not contain "an evaluation of the claimant's mental impairments in accordance wiht 20 CFR 404.1520a and 416.920a." Thus, the Appeals Council directed the ALJ to "take appropriate action to resolve the issues cited above" and, as appropriate, "obtain updated medical records, including clinical findings, test results, and medical source statements about what the claimant can do despite his or her impairment(s)." TR 170.

Plaintiff subsequently received a second hearing. TR 171-174. Plaintiff's second hearing was conducted on December 12, 2000, by ALJ John P. Garner. TR 79. Plaintiff and VE, Deborah Rice, appeared and testified. *Id.* Apparently, in response to the Order of the Appeals Council, Plaintiff was examined by "counseling psychologist" Dr. Patricia Jasnowitz, who submitted a "Psychological Evaluation" and a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" that were considered by the ALJ. TR 587-594.

On February 1, 2001, the ALJ issued a decision unfavorable to Plaintiff, finding that

Case 3:02-cv-01007   Document 21   Filed 08/02/05   Page 5 of 69 PageID #: 5

Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR

19-34.  Specifically, the ALJ made the following findings of fact:

1. The claimant met the disability insured status requirements of the Act on July 10, 1993, his alleged disability onset date, and continued to meet them through June 30, 1997.

2. The claimant has not engaged in substantial gainful activity since July 10, 1993.

3. The claimant's "severe" impairments are anxiety disorder (not otherwise specified), the residuals of a right patellar resurfacing and an arthroscopy of the right knee, and a histories [*sic*] of alcohol dependence and of cocaine dependence, but he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. As discussed above, the claimant's testimony could not be found credible to the extent alleged.

5. The claimant can perform a light level of work with allowances for a light level of work with allowances [*sic*] for the ability to sit or stand at will and for avoiding any kneeling or crawling.  Regarding his mental impairments, the claimant has **mild** restrictions in his activities of daily living, **no** limitations in maintaining social functioning, **mild to moderate** difficulties in maintaining concentration, persistence, or pace, and **no** episodes of decompensation that were of extended duration.  20 CFR §§404.1545 and 416.945.

6. The claimant cannot perform his past relevant work as a shipyard rigger and as a maintenance person.  20 CFR §§404.1565 and 416.965.

7. With a high school education, the claimant is 38 years old, which is defined as a younger individual.  20 CFR §§404.1563, 416.963, 404.1564, and 416.964.

8. The claimant does not have any acquired skills that are transferable to other work within his residual functional capacity.  20 CFR §§404.1568 and 416.968.

6

9. Given his residual functional capacity and vocational factors and using Rule 202.21 as a framework for decisionmaking, a significant number of jobs that the claimant can perform exists in the regional or national economy. Examples and numbers of such jobs are given above. Table 2 of Appendix 2 to Subpart P of Regulations No. 4; 20 CFR §§404.1569 and 416.969.

10. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision. 20 CFR §§404.1520(f) and 416.920(f).

TR 32-33 (bold in original).

On February 22, 2001, Plaintiff timely filed a request for review of the hearing decision. TR 11. In September 2002, [8] the Appeals Council issued a letter declining to review the case (TR 9-10), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. §§ 405(g) and 1383(c)(3). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

### A. Medical Evidence

**1. Physical Disability**

Plaintiff alleges disability due to back and leg pain, headaches, and hearing loss. TR 23.

Dr. James Kelly treated Plaintiff from December 13, 1988 through February 15, 1990. TR 308-316. On December 13, 1988, Plaintiff reported to Dr. Kelly that he fell at work, and that

---

[8]The date stamped on the letter from the Appeals Council is faded and as a result, the exact date in September 2002 cannot be determined. TR 9.

7

he struck his head, back, and shoulders. TR 316. According to Dr. Kelly's records, Plaintiff complained of pain in both shoulders, with more severe pain in the "AC" region on his left side.[9] Id. Dr. Kelly conducted a physical examination and noted tenderness in the "AC" region on the left side. Dr. Kelly also noted "moderate limitation" of motion on the left side, measured as 50 percent of normal range of motion. Id. Dr. Kelly also noted "minimal tenderness" in the "AC" region on the right side with a full range of motion of the shoulder. Id. Dr. Kelly also noted that, "[n]eurocirculatory status is intact bilaterally," and that "[r]eview of his x-rays from E.B. show no fx or destructive process. Weight bearing films show no AC separation." Id. Dr. Kelly's impressions were, a "[c]ontusion on the right side" and "grade 1 AC separation on the left side." Id. Dr. Kelly recommended that Plaintiff apply ice to his shoulders, and placed Plaintiff on Indocin. Id.

Plaintiff returned to Dr. Kelly on December 20, 1988. TR 316. Plaintiff reported continued "moderate soreness in the AC region of his left shoulder." Id. Dr. Kelly noted that Plaintiff still had point tenderness in his left shoulder, and that while Plaintiff had a full range of motion, anything above 90 degrees caused Plaintiff "moderate" discomfort. Id. Dr. Kelly's impression was "persistent symptoms," and he advised Plaintiff to continue using ice and to restrict his activity. Id.

Plaintiff next visited Dr. Kelly on January 4, 1989. TR 316. Dr. Kelly noted that Plaintiff reported "persistent soreness in the left AC region," "soreness into the left paracervical region," and "some crepitance in the cervical spine." Id. Dr. Kelly performed a physical

_____

[9]The "AC" joint is the Acromioclavicular joint, which is the junction of the clavicle (collar bone) and the shoulder.

8

examination and noted "left paracervical tenderness and AC tenderness," "neck mechanics are normal," and mild discomfort at extreme ranges of motion. *Id.* A neurological examination that included motion, sensory, and reflex examinations, was "equal bilaterally." *Id.* Dr. Kelly also noted that Plaintiff had a full range of motion of the shoulder. *Id.* C-spine x-rays revealed "some straightening of the cervical lordosis" and "no fx or destructive process." *Id.* Dr. Kelly's impression was "[s]econdary muscular cervical symptoms," and he recommended that Plaintiff continue to rest for another week. *Id.*

Plaintiff returned to Dr. Kelly on January 18, 1989, reporting that he was "pretty much asymptomatic." TR 315. Dr. Kelly noted "little or no tenderness" and a full range of motion, and he released Plaintiff for work on January 22, 1989. *Id.*

Plaintiff returned to Dr. Kelly's office on February 7, 1989. TR 315. Plaintiff reported that since returning to work, he had been placed in a job that required a lot of climbing and working with "chain floors," and he reported that this work had caused him some recurrent soreness in his "AC" region in his left shoulder. *Id.* Dr. Kelly noted point tenderness in that area and also noted that Plaintiff had a full range of motion. *Id.* Dr. Kelly reported giving Plaintiff a note for "light duty," and told Plaintiff not to climb. *Id.* Dr. Kelly also referred Plaintiff to a physical therapist. *Id.*

On March 7, 1989, Plaintiff reported to Dr. Kelly that he had been on "light duty" at work and that his job did not bother his shoulder. TR 315. According to Dr. Kelly's notes, Plaintiff had been getting therapy at "E.B.," which Dr. Kelly said was "perfectly acceptable." *Id.* Plaintiff also reported intermittent discomfort in his shoulder, particularly on cold, damp days, and with increased physical activity. *Id.* Dr. Kelly noted that Plaintiff had a full range of

9

motion, but that he was not yet ready to go back to full duty at work. *Id.* Dr. Kelly recommended that Plaintiff stay on "light duty," and that he continue to get therapy. *Id.*

On April 11, 1989, Plaintiff reportedly told Dr. Kelly that physical therapy was "really not helping very much." TR 315. Dr. Kelly also noted that Plaintiff complained of some subacromial pain that increased with vigorous physical activity. *Id.* A physical examination revealed anterior and anterolateral subacromial tenderness. *Id.* Dr. Kelly also noted that Plaintiff had a full range of motion, but that anything over 90 degrees caused Plaintiff "moderate discomfort." *Id.* Dr. Kelly's impression was "persistent symptoms," and he injected Plaintiff with 3 cc of Marcaine, 80 of Depo-Medrol. *Id.*

On May 9, 1989, Plaintiff returned to Dr. Kelly and reported that he had been "feeling better," but that he had developed some recurrent pain in his shoulder after "throwing with the Little League Team." TR 314. Dr. Kelly noted "mild tenderness" "anteriorly along the course of the biceps tendon," and noted that Plaintiff had a full range of motion. *Id.* Dr. Kelly placed Plaintiff on Indocin. *Id.*

Plaintiff returned to Dr. Kelly on July 21, 1989, and reported that he had fallen at work and developed soreness in both shoulders, but primarily on the right side. TR 314. A physical examination revealed a full range of motion of both shoulders with good muscle mass and strength. *Id.* Dr. Kelly noted minimal tenderness in the "AC" region on the right side. *Id.* An x-ray of Plaintiff's shoulder revealed "no FX or destructive process." *Id.* Dr. Kelly's impression was that Plaintiff had a new sprain that aggravated his old problems. *Id.* Dr. Kelly also noted that Plaintiff was permitted to continue working, and that Plaintiff was not interested in taking any medication. *Id.*

10

On September 1, 1989, Plaintiff visited Dr. Kelly and reported "aching discomfort" in both shoulders, especially in the "right AC region." TR 314. Dr. Kelly noted that Plaintiff had a full range of motion bilaterally, and that Plaintiff had mild right "AC" tenderness. *Id.* Dr. Kelly placed Plaintiff on Naprosyn and indicated that he would perform an MRI in two weeks if Plaintiff was still symptomatic. *Id.*

Dr. Kelly examined Plaintiff on September 11, 1989. TR 313. Plaintiff reported "considerable soreness" in his right shoulder in the "AC" region after doing some "extra climbing" and "heavy work." *Id.* Plaintiff reported that he had "missed a couple of days of work," and that he continued to feel sore. *Id.* Dr. Kelly noted point tenderness in the "AC" region and a full range of motion in Plaintiff's shoulder. *Id.* Dr. Kelly also noted that Plaintiff's neurocirculatory status was intact. *Id.* Dr. Kelly's impression was "[p]ersistent symptoms," and noted that an MRI would be obtained. *Id.* Dr. Kelly placed Plaintiff on "[l]ight duty" at work with no climbing or lifting over 20 pounds. *Id.*

On September 26, 1989, Dr. Kelly noted that Plaintiff could not get an MRI because Plaintiff had a claustrophobic reaction and did not feel that sedation would help. TR 313. Dr. Kelly referred Plaintiff for more physical therapy. *Id.*

On October 27, 1989, Dr. Kelly performed a physical examination on Plaintiff, and noted that Plaintiff had a full range of motion with some anterior tenderness. TR 313. Plaintiff reported that physical therapy was "helping," although Plaintiff still had "moderate soreness." *Id.* Dr. Kelly recommended more physical therapy. *Id.*

On November 29, 1989, Dr. Kelly noted that Plaintiff was "slowly improving" with physical therapy, and that while Plaintiff had an area of point tenderness along the anterior

11

acromian border, his muscle mass remained good, and his range of motion was full.  *Id.*  Dr.

Kelly recommended that Plaintiff continue on physical therapy for another month.  *Id.*

On January 3, 1990, Plaintiff reported "[s]teady improvement" to Dr. Kelly, and a

physical examination revealed that Plaintiff had a full range of motion in both shoulders.  TR

311.  Dr. Kelly gave Plaintiff a note to return to work.  *Id.*

On January 15, 1990, Plaintiff reported to Dr. Kelly that after he returned to work, he was

immediately given a job which required overhead work and climbing.  TR 311.  Plaintiff

reported recurrent pain in the anterior aspect of his shoulders.  *Id.*  A physical examination

conducted on that date revealed a full bilateral range of motion in the shoulders, moderate

anterior subachromial soreness, and intact neurocirculatory status.  *Id.*  Dr. Kelly gave Plaintiff a

note for "light duty, for 2 weeks, with no climbing."  *Id.*

On January 26, 1990, Plaintiff returned to Dr. Kelly.  TR 311.  Plaintiff reported that

three days earlier while at work, a plate struck him on the anterior aspect of the right knee and

over the antromedial aspect of the tibia.  *Id.*  Plaintiff reported that he developed "considerable

pain and soreness" in his leg.  *Id.*  Plaintiff reported that he had gone to the emergency room,

where x-rays were obtained.  *Id.*  These x-rays revealed "no FX or destructive process."  *Id.*  A

physical examination of Plaintiff's knee conducted by Dr. Kelly revealed a "small anterior

prepatella contusion and superficial abrasion."  *Id.*  Dr. Kelly noted that Plaintiff had from 0 to

120 degrees of flexion in his knee and no medial or lateral instability at 0 or 30 degrees.  *Id.*  Dr.

Kelly noted that there was no "Drawer's sign," "Lachman's test," or "posterior Drawer's sign."

*Id.*  An examination of Plaintiff's tibia revealed a "contusion over the antromedial aspect of the

tibia with a superficial abrasion."  *Id.*  Dr. Kelly also noted that Plaintiff had a full range of

12

motion in his foot and ankle, and that his neurocirculatory status was intact. *Id.* Dr. Kelly's impression was a "[c]ontusion of the knee and tibia." *Id.* Dr. Kelly recommended that Plaintiff continue using his knee immobilizer and rest his leg for another week. *Id.*

On February 2, 1990, Dr. Kelly noted that Plaintiff's leg was "moderately improved" but that he still had "some swelling and soreness." TR 310. Dr. Kelly noted that Plaintiff could walk without any form of external support, and that Plaintiff's range of motion in his knee and ankle was "good." *Id.* Dr. Kelly noted that Plaintiff could return to work on February 13, 1990. *Id.*

On February 15, 1990, Plaintiff returned to Dr. Kelly and reported that he had hurt his back at the same time that he had hurt his leg. TR 310. Dr. Kelly noted that Plaintiff had not complained of this injury previously, and when asked why he failed to do so, Plaintiff responded that he did not think much about his back because the pain in his leg was so severe. *Id.* Plaintiff complained of "pain in the lumbar region of his back without radicular component, associated weakness or paresthesias." *Id.* Dr. Kelly also reported that Plaintiff stated that he had not been able to return to work because of the pain in his back. *Id.* A physical examination revealed some "mild lumbar tenderness with no spasm." *Id.* Dr. Kelly noted that Plaintiff's mechanics were "approximately 75% of normal," and that Plaintiff's motor and reflex examinations were normal. *Id.* Plaintiff's straight leg raising test was negative. *Id.* X-rays revealed "good alignment of [Plaintiff's] vertebral bodies," "well-preserved" disc spaces, and "no FX or destructive process." *Id.* Dr. Kelly's impression was a "[l]umbar sprain." *Id.* Dr. Kelly also noted a "palpable mass" on Plaintiff's left side, and noted that Plaintiff attributed this mass to the accident that caused his back and leg pain. *Id.* Dr. Kelly noted that he would refer Plaintiff to a

13

general surgen, that Plaintiff should rest his back for 10 days, and that Plaintiff hopefully would be returned to work after 10 days had passed. *Id.*

On April 5, 1990, Dr. John N. German completed a "report of consultation" regarding Plaintiff. TR 318. Dr. German noted that Plaintiff reported that a heavy steel bar was dropped on him at work. *Id.* Dr. German noted that Plaintiff also reported "progressive discomfort in his left groin extending into the hip and occasionally into the back," and that the discomfort "rarely extends into the leg." *Id.* Plaintiff also reported numbness over the anterior thigh on his left side. *Id.* Plaintiff also reported that he had no trouble walking on a flat surface, but that he struggled to walk up a hill or climb stairs. *Id.* A physical examination revealed a "normal lumbar lordosis," "slight increase in groin pain," and "extreme of hyperextension or lateral bending to the left." *Id.* Dr. German noted that Plaintiff's straight leg raise was negative on the right and "only faintly positive" on the left. *Id.* Dr. German noted that Plaintiff had reflexes "2+ and equal at the ankles" and "2+ right quadriceps, absent left quadriceps." *Id.* Dr. German also noted that Plaitniff had a "faint L3 hypesthesia over the left quadriceps" and evidence of weakness on that side, but noted that Plaintiff was difficult to test because of the size of his muscles. *Id.* Dr. German opined that Plaintiff "probably has an L2-3 or L3-4 disc herniation or direct contusion of his femoral nerve." *Id.* Dr. German ordered a CT scan and told Plaintiff not to work until at least April 17. *Id.*

Plaintiff was admitted to Lawrence and Memorial Hospital on May 10, 1990, complaining of back and leg pain. TR 317. A CT scan demonstrated "only a narrow canal," and an MRI was "very difficult to observe," but it appeared to demonstrate "only a narrowed spinal canal." *Id.* Dr. German admitted Plaintiff for a myelogram. *Id.* The myelogram demonstrated a

"very small lateral disc protrusion at L4-5 due to the extreme narrowing of his spinal canal." *Id.*
Dr. German's impression was "[h]erniated lumbar disc, L4-5 left." *Id.* Plaintiff was discharged on May 11, 1990. *Id.*

Plaintiff reported to the emergency room at Metropolitan Nashville General Hospital on December 15, 1991, complaining of pain in his right foot. TR 430. An x-ray of Plaintiff's foot was taken, the result of which was normal. TR 429. Plaintiff's foot was wrapped and he was given ice. TR 430. Plaintiff returned to the emergency room on December 26, 1991, once again complaining of pain in his right foot. TR 428. X-rays were taken, and their results were normal. TR 427. Plaintiff was advised to take Motrin and to remain on crutches. TR 428.

Plaintiff returned to the emergency room at Metropolitan Nashville General Hospital on February 26, 1992, complaining of swelling in his left foot. TR 425-426. X-rays were taken, and Plaintiff's x-ray report noted "soft tissue swelling" but "no definite acute bony abnormalities." TR 425 (capitalization omitted). Plaintiff did have "mild chronic appearing changes" at the "first MP joint." *Id.* (capitalization omitted).

Plaintiff returned to the emergency room at Metropolitan Nashville General Hospital on August 20, 1992, complaining of pain in his right ankle. TR 424. X-rays were taken, and in Plaintiff's x-ray report, Dr. John A. Molin noted that Plaintiff appeared to have an "osteochondral fracture" and "mild degenerative changes in the talotibial joint." TR 423.

Plaintiff returned to the emergency room at Metropolitan Nashville General Hospital on September 4, 1993. TR 421-422. Dr. Kenneth Cook took x-rays of Plaintiff's knee and noted "significant suprapatella soft tissue swelling. Signs of DJD present." TR 421. Dr. Cook also noted, however, that the x-ray needed to be repeated. *Id.*

Medical records were also obtained from Matthew Walker Health Center.[10]  TR 320-323. Plaintiff's first appointment was on July 13, 1994, and, at the time, he complained of trouble with his lower back and both legs.  TR 320.  Plaintiff reported that his ankles were "swelling all the time."  *Id.*  Plaintiff also reported asthma and falling asleep while sitting.  *Id.*  The doctor who examined Plaintiff recommended a Proventil inhaler, Tylenol, Amoxicillin, routine laboratory tests, and a chest x-ray.  *Id.*  At this time, Plaintiff stated that he could not afford his tests and prescriptions.  *Id.*

Plaintiff returned to the Matthew Walker Health Center on August 18, 1994.  TR 321. Plaintiff reported leg cramping, allergy problems, sinus trouble, and trouble sleeping.  *Id.* Plaintiff also complained that if he sat down, he fell asleep.  *Id.*  Plaintiff reported that he smoked 1/3 of a pack of cigarettes per day, and he was advised to stop smoking.  TR 321-322.  Plaintiff told his examiner that he had not filled his prescriptions from his previous appointment because he did not have the money to pay for them.  TR 322.  The examiner diagnosed Plaintiff with "Allergic Rhinitis" with "sinusitis" and "Lt. otitis media."  *Id.*

Plaintiff returned to the emergency room at Metropolitan Nashville General Hospital on November 7, 1994, where he was examined by Dr. Lance Weaver.  TR 418.  Plaintiff complained of pain and swelling in his right knee.  *Id.*  An x-ray of Plaintiff's knee was taken, and Dr. Gabrielle Gill noted that Plaintiff's x-ray demonstrated "what appears to be a fracture of the superolateral aspect of the patella.  There is a large suprapatella effusion present."  TR 414. Plaintiff returned to the emergency room on November 8, 1994 and November 15, 1994,

---

[10]Many of these records are illegible, and the name of the individual who examined Plaintiff on these occasions was not included in these records.  TR 320-323.

complaining of similar symptoms. TR 412-413. Once again, a patella fracture was diagnosed. TR 412.

Plaintiff returned to the emergency room at Metropolitan Nashville General Hospital on November 29, 1994, where he was examined by Dr. William Bacon. TR 408. X-rays were taken of Plaintiff's knee, and Dr. Gill noted a reduction in the swelling in Plaintiff's knee, but that nothing else had changed since his last x-ray. TR 407.

Plaintiff was first examined at the office of Dr. Winston H. Griner and Dr. Ralph S. Hobbs on December 5, 1994.[11] TR 379. At that examination, Plaintiff reported pain in his knees. *Id.* The doctor who examined Plaintiff prescribed medications to Plaintiff and referred Plaintiff to Dr. Weaver. *Id.*

Plaintiff returned to the office of Drs. Griner and Hobbs on December 12, 1994, complaining of knee pain. TR 378. Once again, the doctor who examined Plaintiff prescribed medications. *Id.*

Plaintiff returned to the office of Drs. Griner and Hobbs on January 23, 1995, reporting that he fell at an "apartment complex show." TR 377. The doctor who examined Plaintiff diagnosed right shoulder pain and prescribed medications. TR 377.

Plaintiff was examined by Dr. Griner on April 3, 1995, complaining of shoulder and wrist pain, as well as pain and swelling in his right knee. TR 376. Dr. Griner took x-rays of Plaintiff's knee and wrist and diagnosed "x-ray - +Fx [*sic*]." *Id.* Dr. Griner also referred Plaintiff to a

---

[11]Both Dr. Griner and Dr. Hobbs have examined Plaintiff on various dates. Both doctors' signatures, however, are illegible. For this reason, it is often impossible to ascertain which doctor examined Plaintiff on which date. Dr. Griner's initials are legible on some of the records, however.

vocational rehabilitation program. *Id.*

Plaintiff returned to the office of Drs. Griner and Hobbs on May 15, 1995. TR 375. The doctor who examined Plaintiff diagnosed Plaintiff with right knee pain and prescribed medication. *Id.*

Plaintiff returned to the office of Drs. Griner and Hobbs on June 21, 1995. TR 374. The doctor who examined Plaintiff diagnosed Plaintiff with "R Knee fx [*sic*]" and referred Plaintiff to a vocational rehabilitation program. *Id.*

Dr. Earl Campbell performed a consultative examination of Plaintiff on May 7, 1996. TR 326-328. Plaintiff complained of pain in his legs and thighs that was aggravated by walking uphill or up stairs. TR 326-327. Plaintiff told Dr. Campbell that he had not sought medical treatment for the past two and a half years because of lack of insurance. TR 326. Plaintiff also complained of shortness of breath aggravated by bending. *Id.* Plaintiff denied a history of asthma or chronic bronchitis, and stated that although he used to smoke, he had not smoked in the past six months. *Id.* Dr. Campbell noted that Plaintiff's breath sounds were equal bilaterally with no wheeze, rales, or rhonchi. TR 327. Dr. Campbell noted that there was no swelling, redness, or tenderness in Plaintiff's extremities, and that his motor system was "grade 5/5 throughout." *Id.* Dr. Campbell conducted range of motion tests on Plaintiff and reported a range of motion of 130 degrees of flexion and 0 degrees of extension bilaterally in Plaintiff's knees, 40 degrees of abduction in Plaintiff's hips, 20 degrees of adduction in Plaintiff's hips, 120 degrees of flexion in Plaintiff's hips, 30 degrees of exension in Plaintiff's hips, internal rotation of 40 degrees in Plaintiff's hips, and external rotation of the hips 30 degrees actively and passively bilaterally. *Id.* Dr. Campbell opined that Plaintiff's pain was "possibly related to myositis" and

that his shortness of breath could "possibly be related to bronchial asthma." TR 328. Dr. Campbell noted that he would recommend pulmonary function testing to Plaintiff. *Id.*

Dr. Campbell opined that Plaintiff could occasionally lift and pull a maximum of 100 pounds, frequently lift and pull a maximum of 50 pounds, stand or walk for at least six hours in an eight-hour workday, and sit for at least six hours in an eight-hour workday. TR 328.

Dr. George W. Bounds conducted a Physical Residual Functional Capacity Assessment of Plaintiff on May 30, 1996. TR 330-337. Dr. Bounds opined that Plaintiff could frequently lift and/or carry 50 pounds, occasionally lift and/or carry 25 pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push and pull with no limitations. TR 331. Dr. Bounds further opined that Plaintiff could frequently climb, balance, stoop, kneel, crouch, and crawl. TR 332. No manipulative, visual, communicative, or environmental limitations were noted. TR 333-334.

On July 8, 1996, Plaintiff returned to the office of Drs. Griner and Hobbs. TR 373. Plaintiff complained of pain in both shoulders, as well as pain in his right leg. *Id.* The doctor who examined Plaintiff diagnosed Plaintiff with bursitis in both shoulders and the right knee, and prescribed medication. *Id.*

On September 21, 1996, Plaintiff saw Dr. Griner, complaining of leg and shoulder pain. TR 372. Dr. Griner diagnosed him with "knee patella pain" in his right leg, prescribed a knee brace, and referred Plaintiff to Dr. Bacon, an orthopaedist. *Id.* Dr. Griner also referred Plaintiff to vocational rehabilitation. *Id.*

On November 26, 1996, Plaintiff presented to Dr. Griner with a cyst on his right leg. TR 371. Dr. Griner diagnosed a popliteal cyst on Plaintiff's right leg, and referred Plaintiff to Dr.

Lloyd Walwyn.  *Id.*

Plaintiff was examined by Dr. Griner on January 7, 1997.  TR 370.  Plaintiff complained of knee and elbow pain.  *Id.*  Dr. Griner ordered an x-ray of Plaintiff's elbow, which revealed "small opaque loose bodies" but no "lesion" or "post-traumatic abnormalities."  TR 370; 387.  Dr. Griner again referred Plaintiff to Dr. Bacon.  TR 370.

Dr. Griner examined Plaintiff on February 17, 1997.  TR 369.  Dr. Griner referred Plaintiff to Dr. Charles Emerson for evaluation of the pain in Plaintiff's right knee.  *Id.*

Plaintiff reported to the emergency room at Columbia Southern Hills Medical Center on March 15, 1997, complaining of an injury to his right knee.  TR 558.  Dr. Jules Whiteman ordered x-rays of Plaintiff's knee, which revealed a patella fracture.  *Id.*  Dr. Whitman diagnosed Plaintiff with a fractured patella, put Plaintiff in a knee immobilizer, and gave Plaintiff crutches. *Id.*

Dr. Emerson diagnosed Plaintiff with "patellofemoral arthritis secondary to osteochondritis and either old fracture or bipartite patella," on March 18, 1997.  TR 455.  Dr. Emerson then performed a resurfacing of Plaintiff's right patella utilizing a "cemented 41 mm x 10 mm" polythene patella.  *Id.*  Dr. Emerson noted that there was "a definite step-off deformity and crepitus with loosening of a large portion of the articular segment of the superior lateral aspect of the patella.  There was also crevicing and early breakdown of the hyaline cartilage in the intercondylar notch which was compatible with osteochondrosis of the interarticular surface of the femur and the patella."  *Id.*  Dr. Emerson's postoperative diagnosis was "patellofemoral arthritis secondary to osteochondritis and either old fracture or bipartite patella."  *Id.*

Dr. Emerson examined Plaintiff on March 21, 1997, and noted that Plaintiff had

20

"ongoing significant swelling" in his knee and calf since he fell shortly after his operation.  TR
391.  Dr. Emerson noted that Plaintiff was "doing well" and that Plaintiff had started his physical
therapy program.  *Id.*

On April 2, 1997, Dr. Emerson examined Plaintiff.  TR 390.  Plaintiff reported that he
was experiencing "less pain and increased mobility."  *Id.*  Dr. Emerson discontinued Plaintiff's
knee immobilizer, and noted that Plaintiff needed to work on improving flexion in his knee.  *Id.*

On April 16, 1997, Plaintiff returned to Dr. Emerson, complaining of "some discomfort
in the quad and hamstring muscle areas."  TR 389.  Dr. Emerson noted that Plaintiff's flexion
and extension had improved to "full extension and 110-115 degrees of flexion."  *Id.*  In
particular, Dr. Emerson noted that Plaintiff had full extension and 110-115 degrees of flexion.
*Id.*  Dr. Emerson stated that Plaintiff would continue physical therapy for one more week.  *Id.*

On May 5, 1997, Plaintiff returned to the emergency room at Metropolitan Nashville
General Hospital, complaining of pain and swelling in his right knee.  TR 406.  Both a venogram
and a duplex scan of Plaintiff's knee were negative except for a Baker's cyst.  TR 404.  An
ultrasound of Plaintiff's knee showed no evidence of deep venous thrombosis in Plaintiff's leg.
TR 399.

Another doctor[12] conducted a Physical Residual Functional Capacity Assessment of
Plaintiff on June 5, 1997.[13]  TR 356-362.  The doctor opined that Plaintiff could frequently lift

---

[12]The name of the doctor who completed this evaluation does not appear on the
document.

[13]It is possible that a page of this assessment is missing.  The table of contents notes that
this assessment starts on page 356 and ends on page 362A.  The record, however, does not
contain a page numbered "362A."

21

and/or carry 50 pounds, occasionally lift and/or carry 25 pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push and pull with no limitation. TR 357. The doctor further opined that Plaintiff could frequently climb ramps or stairs, balance, stoop, and crouch, and that Plaintiff could occasionally climb a ladder/rope/scaffold, kneel, and crawl. TR 358. No manipulative, visual, communicative, or environmental limitations were noted. TR 359-360. A medical consultant's review of this assessment dated June 5, 1997,[14] noted agreement with regard to Plaintiff's symptoms and limitations. TR 363.

Dr. Emerson examined Plaintiff on June 10, 1997, noting that Plaintiff reported recently twisting his right knee. TR 454. Dr. Emerson noted that Plaintiff had "active muscle function of his quad muscle, with full extension with some discomfort in the suprapatellar area." *Id.* Dr. Emerson also noted tenderness along Plaintiff's hamstring. *Id.* Dr. Emerson took x-rays of Plaintiff's knee, and diagnosed a "contusion of the knee, as well as the hamstring muscles." *Id.* Dr. Emerson prescribed medications to Plaintiff, and advised him to apply heat. *Id.* Dr. Emerson told Plaintiff that he could resume normal activity as long as comfort permitted it. *Id.*

Between August 25, 1997 and February 9, 1998, Dr. Hobbs examined Plaintiff on multiple occasions. TR 516-520. Dr. Hobbs' impressions were tenderness in Plaintiff's right knee, occasional rhonchi, and elevated blood pressure. *Id.* Dr. Hobbs' diagnoses included hypertension, degenerative joint disease, sinusitis, asthma, and right knee pain. *Id.*

Dr. Malcom Baxter examined Plaintiff on January 20, 1998. TR 452-453. Plaintiff

---

[14]It appears that this review form had a second page that is missing from the record. According to the table of contents, this document starts on page 363 and ends on page 363A. No page numbered "363A" appears in the record.

complained of pain and swelling in his right knee, as well as pain in his lower back. TR 452. Dr. Baxter noted that Plaintiff felt pain in the back of his knee, and that the pain was related to increased activity. *Id.* Dr. Baxter found that Plaintiff's knee had somewhat diminished strength and ranges of motion but that it was stable and could bear Plaintiff's full weight. *Id.* Dr. Baxter found tenderness in Plaintiff's low back area, but Plaintiff's straight leg raises were negative bilaterally. *Id.* Dr. Baxter further noted that Plaintiff had a limited range of motion in his lower back. *Id.* X-rays of Plaintiff's knee were negative, and an x-ray of Plaintiff's back revealed "early to slight degenerative changes" of the lumbar spine. *Id.* Dr. Baxter could not explain the source of Plaintiff's knee pain, although he opined that it was caused by a soft tissue injury or inflammation. TR 453.

Plaintiff returned to Dr. Emerson on February 17, 1998, complaining of continued swelling and pain in the back of his right knee. TR 451. Dr. Emerson noted that Plaintiff demonstrated "marked localized tenderness," but "no mass or erythema present." *Id.* Plaintiff had full extension in his knee, although he felt pain. *Id.* Plaintiff also demonstrated 95-100 degrees of flexion. *Id.* Dr. Emerson noted that "the patella is tracking well." *Id.* Dr. Emerson's assessment was tendinitis in Plaintiff's hamstring. *Id.* Plaintiff declined an injection, and Dr. Emerson advised Plaintiff to apply heat. *Id.*

Plaintiff returned to the office of Drs. Griner and Hobbs on April 13, 1998.[15] TR 514.

On April 29, 1998, Plaintiff presented to Dr. Emerson with joint pain in his right knee. TR 450. On this date, Plaintiff consented to an injection of Dexamethasone and Lidocaine in his knee. *Id.*

_____

[15]The notes from this examination are illegible.

Plaintiff returned to Dr. Emerson on June 2, 1998, complaining mainly of muscle tightness in the back of his leg. TR 449. Dr. Emerson found that Plaintiff was "much improved" since his last visit, and noted full extension and "almost full flexion." *Id.*

Plaintiff returned to the office of Drs. Griner and Hobbs on July 1, 1998, complaining of shortness of breath, chest pain, and a sore throat. TR 513. The doctor who examined Plaintiff[16] diagnosed Plaintiff with acute bronchitis. *Id.* Plaintiff returned to the office of Drs. Griner and Hobbs on July 6, 1998, and the doctor who examined Plaintiff[17] diagnosed Plaintiff with sinusitis.[18] TR 512.

Plaintiff went to the emergency room at Centennial Medical Center on July 16, 1998, where he reported abdominal pain to Dr. David Buckman. TR 474-475. Plaintiff reported that he had no history of alcohol abuse, but that he did smoke approximately one pack of cigarettes each day. TR 474. Dr. Buckman ordered CT scans of Plaintiff's abdomen and pelvis, both of which were normal. TR 476. Dr. Buckman diagnosed Plaintiff with diabetes mellitus. TR 475. Dr. Buckman further ordered that Plaintiff be transferred to another hospital for further care. *Id.*

Dr. Emerson completed a Medical Assessment of Ability to Do Work-Related Activities form on July 20, 1998. TR 446-448. Dr. Emerson opined that Plaintiff could occasionally lift or carry 10 pounds, stand and/or walk between two and three hours in an eight-hour workday, and sit for a full eight-hour workday. TR 446-447. Dr. Emerson further opined that Plaintiff could occasionally climb, stoop, balance, or crouch, but that Plaintiff could never kneel or crawl. TR

---

[16]The notes from this examination are not signed.

[17]The notes from this examination contain an illegible signature.

[18]The doctor who examined Plaintiff made a second diagnosis, but it is illegible.

447. Dr. Emerson noted that Plaintiff was not impaired in his ability to reach, handle, feel, push, pull, see, speak, or hear. *Id.* Dr. Emerson further noted that Plaintiff was restricted in his ability to work around heights, but that he had no other environmental restrictions.[19] TR 448.

Plaintiff returned to the office of Drs. Griner and Hobbs on July 27, 1998, complaining of knee pain and blurred vision. TR 510. The doctor who examined Plaintiff[20] diagnosed Plaintiff with a "vision error" and diabetes mellitus. *Id.*

Plaintiff returned to the office of Drs. Griner and Hobbs on August 18, 1998, complaining of pain and swelling in his legs. TR 509. The doctor who examined Plaintiff[21] diagnosed Plaintiff with sinusitis, diabetes mellitus, and degenerative joint disease.[22] *Id.*

On September 1, 1998, Dr. Andani S. Prakash examined Plaintiff. TR 457-459. Plaintiff presented with a history of diabetes and pain in his lower extremities. TR 457. Dr. Prakash conducted a series of laboratory tests. TR 457-458. The results of all of Plaintiff's laboratory tests were normal, except that his "Right Tibial Nerve F response latency" and "Right H reflex latency" were "prolonged." TR 458. Dr. Prakash noted that Plaintiff's test results were "consistent with" "right S1 radiculopathy with evidence of mild denervation." TR 459 (capitalization omitted). Dr. Prakash further noted that there was "NO evidence of Peripheral Neuropathy secondary to diabetes." *Id.*

---

[19]With regard to Plaintiff's ability to work around moving machinery, Dr. Emerson placed his check mark halfway between the "yes" and "no" sections of the form. Therefore, it is unclear what Plaintiff's limitations are, if any, around moving machinery. TR 448.

[20]The signature on this form is illegible.

[21]The signature on this form is illegible.

[22]The doctor who examined Plaintiff made additional diagnoses, but they are illegible.

On September 9, 1998, Plaintiff returned to the office of Drs. Griner and Hobbs complaining of a toothache and pain/swelling in his right leg. TR 508. The doctor who examined Plaintiff noted that Plaintiff had a positive straight leg raise, tenderness, and parathesias. *Id.* This doctor ordered x-rays of Plaintiff's lumbar spine. *Id.* An x-ray report was completed by Dr. Scott D. Gray on September 16, 1998. TR 586. Dr. Gray's impressions were "Early DISH" and "no fracture or degeneration demonstrated." *Id.*

On October 8, 1998, Plaintiff was examined by Dr. Douglas, a colleague of Drs. Griner and Hobbs. TR 507. Plaintiff's straight leg raise was positive, and Dr. Douglas diagnosed lower back pain, radiculopathy, and sciatica. *Id.*

Dr. Griner examined Plaintiff on November 6, 1998. TR 505. Plaintiff complained of lower back pain. *Id.* Dr. Griner noted that Plaintiff had positive straight leg raise and dorsoflexion tests. *Id.* Dr. Griner's impression was lower back pain. *Id.*

Dr. Griner examined Plaintiff again on December 21, 1998. TR 504. Plaintiff complained of lower back pain, and Dr. Griner noted that Plaintiff's straight leg raise and dorsoflexion tests were negative. *Id.* Dr. Griner referred Plaintiff to vocational rehabilitation. *Id.*

Plaintiff reported to the emergency room at Centennial Medical Center on January 3, 1999, complaining of pain and edema in his left elbow. TR 471. Dr. Buckman examined Plaintiff and noted that Plaintiff demonstrated "[d]iffuse soft tissue edema," but that there was no fracture or dislocation evident in Plaintiff's arm. *Id.* Dr. Buckman's final impression was "[e]lbow contusion." TR 470.

Plaintiff returned to the office of Drs. Griner and Hobbs on January 20, 1999. TR 503.

26

Plaintiff complained of pain in his left shoulder and right leg. *Id.* The doctor who examined Plaintiff diagnosed left shoulder pain, right radiculopathy, "HTN," diabetes mellitus, and "GAD." *Id.*

Plaintiff returned to the office of Drs. Griner and Hobbs on March 5, 1999; April 5, 1999; and May 5, 1999.[23] TR 500-502.

Dr. Hobbs examined Plaintiff on June 4, 1999, and noted that a straight leg raise of Plaintiff's left leg was positive. TR 499. Dr. Hobbs noted that Plaintiff had lower back pain and degenerative disc disease. *Id.*

Dr. James D. Green performed an MRI of Plaintiff's back on June 25, 1999. TR 582-583. In his report, Dr. Green noted the following: "congenital narrowing of the lumbar canal and neural foramina at end below the L2 level"; "mild to moderate disc degeneration L4-5 and also L1.2"; "disc bulge, congenital narrowing, and facet degeneration result in moderate central spinal stenosis L3-4"; "[d]isc bulge with superimposed mild to moderate broad-based disc protrusion laterally to the left L4-5. This is superimposed on congenital narrowing, with resultant moderate central spinal stenosis, and moderate to severe left lateral recess encroachment, and left neural foraminal encroachment"; and "lateral disc bulge at L5-S1 plus facet hypertrophy, superimposed on congenital narrowing result in moderate neural foraminal encroachment bilaterally at this level." TR 583.

On July 9, 1999, a nurse practitioner under the supervision of Dr. Griner examined Plaintiff. TR 498. This nurse practitioner found a positive straight leg raise, but normal deep tendon reflexes, and no tenderness in the lower back. *Id.* The nurse practitioner diagnosed

---

[23]The notes from these examinations are illegible.

"myofascial syndrome" and "L5-S2 radiculopathy." *Id.*

On August 31, 1999, Dr. Griner examined Plaintiff and diagnosed lower back pain with radiculpathy. TR 496. Dr. Griner repeated this diagnosis on November 23, 1999. TR 495.

On January 12, 2000, Plaintiff returned to the office of Drs. Griner and Hobbs complaining of left knee pain, bilateral hip pain, and sinus congestion. TR 494. The doctor who examined Plaintiff diagnosed Plaintiff with left knee pain. *Id.* Dr. Hobbs referred Plaintiff to Dr. Alice A. Hinton for x-rays. TR 584. On January 13, 2000, Dr. Hinton completed an x-ray report, and noted that "mild degenerative changes are seen laterally," but that there was "[n]o evidence of acute bony trauma or significant degenerative disease." *Id.*

Dr. Hobbs referred Plaintiff to Dr. James D. Green for an MRI of Plaintiff's left knee. TR 585. In an MRI report dated February 21, 2000, Dr. Green noted that his impressions were "small joint effusion," "mild degenerative changes at the patellofemoral articulation," and "complex tear posterior horn at the medial meniscus, with vertical component and probable bucket-handle component at its central aspect." *Id.*

On May 25, 2000, Plaintiff reported to the emergency room at Metropolitan Nashville General Hospital, complaining of pain in his left leg. TR 541. On May 26, 2000, Dr. John Collins diagnosed Plaintiff with a "[t]orn [l]eft [m]edial [m]eniscus," and performed a diagnostic arthroscopy of Plaintiff's left knee. TR 532. Dr. Collins noted that Plaintiff had "some fraying" and a "small partial tear of the anterior cruciate ligament." *Id.* Dr. Collins's postoperative diagnosis was "partial tear of left anterior cruciate ligament, mild arthritis of left knee, mild patellofemoral chondromalacia of left knee." *Id.*

On June 13, 2000, Plaintiff returned to the office of Drs. Griner and Hobbs, complaining

28

of degenerative joint disease of both knees. TR 490. The doctor who examined Plaintiff

diagnosed Plaintiff with Type II diabetes mellitus. *Id.* The doctor also noted that Plaintiff's

glucose level was 145. *Id.*

Plaintiff returned to the emergency room at Centennial Medical Center on June 25, 2000,

complaining of neck pain. TR 466-468. Dr. Gary Singer ordered x-rays of Plaintiff's neck, the

results of which were negative. TR 468. Dr. Singer diagnosed Plaintiff with a neck strain. TR

466.

Plaintiff returned to the office of Drs. Griner and Hobbs on August 1, 2000, complaining

of bilateral knee pain. TR 489. The doctor who examined Plaintiff noted that Plaintiff's glucose

level was 122 and prescribed medication. *Id.*

On August 24, 2000, Dr. Emerson opined that Plaintiff could occasionally carry 100

pounds or more, frequently carry up to 50 pounds, could stand and/or walk for six hours in an

eight-hour workday, and could sit for an entire workday. TR 461-462. Dr. Emerson opined that

Plaintiff had no limitations in his ability to push or pull. TR 462. Dr. Emerson noted that

Plaintiff could frequently balance, occasionally climb, and could never kneel, crouch, or crawl.

*Id.* No manipulative, visual, communicative, or environmental limitations were noted. TR 463.

On September 1, 2000, Dr. Hobbs examined Plaintiff, who complained of pain in his

back and legs. TR 581. Dr. Hobbs noted that Plaintiff's glucose level was 131. *Id.* Dr. Hobbs

diagnosed Plaintiff with lower back pain and degenerative joint disease in both knees. *Id.*

On September 6, 2000, Dr. Hobbs completed a "Medical Source Statement of

[Plaintiff's] Ability to Do Work-Related Activities (Physical)." TR 481-483. Dr. Hobbs opined

that Plaintiff could occasionally lift and/or carry 10 pounds, frequently lift either 10 pounds or

less than 10 pounds,[24] and stand and/or walk for less than two hours in an eight-hour workday.

TR 481. Dr. Hobbs further opined that Plaintiff could sit for less than about six hours in an

eight-hour workday, and that his ability to push and pull were limited. TR 482. Dr. Hobbs noted

that Plaintiff could never climb, balance, kneel, crouch, or crawl, and that Plaintiff was limited in

his ability to reach, handle, finger, and feel objects. TR 482-483. No visual or communicative

limitations were noted. *Id.* Dr. Hobbs indicated that Plaintiff was limited in his ability to work

around vibration, but that Plaintiff had no other environmental limitations. TR 483.

On the same day that Dr. Hobbs completed his Medical Source Statement, Dr. Hobbs

also completed a Medical Opinion Form regarding Plaintiff. TR 525-527. Dr. Hobbs opined

that Plaintiff could sit for two and a half hours in an eight-hour workday, and that Plaintiff could

sit for 20 minutes at a time. TR 525. Dr. Hobbs reported that Plaintiff could stand or walk for

one and a half hours in an eight-hour workday, and that Plaintiff could stand or walk for 10

minutes at a time. *Id.* Dr. Hobbs opined that Plaintiff could occasionally lift between one and

five pounds, infrequently lift between one and 10 pounds, and never lift 11 or more pounds. *Id.*

Dr. Hobbs further opined that Plaintiff could never bend at the waist, reach above his shoulders,

stand on a hard surface, or use his hands for fine manipulation. *Id.*

Dr. Hobbs reported that Plaintiff had been advised to elevate one or both legs for 30

minutes at a time, four to five times per day, and that Plaintiff required four hours of bed rest

during a normal workday. TR 526. Dr. Hobbs further reported that Plaintiff did not have

problems with stamina or endurance, and that Plaintiff's subjective complaints "seem

---

[24]Dr. Hobbs' check mark fell between the "less than 10 pounds" and "10 pounds" boxes,
thus his answer to this question is unclear.

30

reasonable." *Id.* Dr. Hobbs stated that Plaintiff could not be reasonably expected to be reliable in attending a job requiring a 40 hour work week. *Id.* Dr. Hobbs noted that Plaintiff's pain was "extreme," and that it was "reasonable" that Plaintiff's pain or medication would cause lapses in concentration or memory on a regular basis. *Id.* Dr. Hobbs opined that Plaintiff's condition could cause lapses in concentration or memory for several hours every day. *Id.* Dr. Hobbs reported that Plaintiff did not have any environmental limitations. TR 527. Dr. Hobbs stated that Plaintiff had a "reasonable medical need to be absent from a full time work schedule on a chronic basis." *Id.*

Dr. Hobbs examined Plaintiff on September 22, 2000. TR 580. Plaintiff's chief complaint was lower back pain, and Dr. Hobbs diagnoses included lower back pain.[25] *Id.*


## 2. Mental Disability

Plaintiff also alleges disability due to depression, anxiety, and borderline intellectual functioning. Docket Entry No. 14.

Dr. Deborah E. Doineau conducted a consultative psychological examination of Plaintiff on June 16, 1996. TR 338-342. Plaintiff complained of pain in his legs, headaches, back pain, fatigue, moodiness, and a fear of closed-in places. TR 338. Dr. Doineau noted that Plaintiff stated that he wanted to work, but felt that he was "often not prepared to deal with it when the time comes." *Id.* In particular, Dr. Doineau noted that Plaintiff reported having trouble "dealing with bosses who raise their voice [*sic*] toward him or reprimand him." *Id.* Dr. Doineau noted that Plaintiff had a history of alochol and drug abuse, but that Plaintiff stated that he had never

---

[25]Dr. Hobbs' second diagnosis is illegible.

31

been arrested in conjunction with alcohol or drug usage. TR 339. Plaintiff also reported having been prescribed Prozac and an unidentified psychotropic medication by doctors. *Id.*

Plaintiff told Dr. Doineau that shortly after graduating from high school, he was hit in the back of the head with a shotgun, and that he had "never been the same" since that incident. TR 339. Dr. Doineau noted that Plaintiff presented with "clear, coherent, goal-directed speech"; his "affect was anxious"; his "mood was generally euthymic"; his "memory seemed grossly intact"; his "insight seemed limited"; and his "judgment appeared to be intact." TR 340. Dr. Doineau further noted that Plaintiff seemed oriented to person, time, place, and situation. *Id.* Plaintiff denied experiencing auditory or visual hallucinations, but Dr. Doineau noted that there was evidence that Plaintiff experienced systemized delusional thinking. *Id.*

Dr. Doineau noted that Plaintiff described decreased energy, decreased motivation, feelings of irritability, and feelings of hopelessness. TR 340. Plaintiff also reported trouble sleeping and chronic feelings of low self-esteem. *Id.* Plaintiff further reported that he felt "nervous, shaky, and experiences a choking sensation, heart palpitations, extreme fear, and sweating when he is in narrow places or in crowds." *Id.*

Dr. Doineau noted that Plaintiff reported getting up at different times of day, and that after he got up he would watch television, then go outside and talk to friends for two or three hours. TR 340. Plaintiff reported that he visited with friends three days each week. *Id.* Plaintiff further reported that, after lunch, he would often go back outside and socialize and drink with his friends. TR 341. Plaintiff also reported enjoying going for walks within a reasonable distance of his home, and he reported that, on "a better day," he might go to the park, walk to a ball game, and/or have a picnic. *Id.* Dr. Doineau noted that Plaintiff was capable of shopping for himself

and making his own decisions. *Id.*

Dr. Doineau administered the Wechsler Adult Intelligence Scale - Revised ("WAIS-R") to Plaintiff, and noted that Plaintiff was "highly anxious" during the test and "seemed to give up unusually easily." TR 341. Plaintiff's WAIS-R testing revealed a verbal I.Q. of 76, a performance I.Q. of 65, and a full scale I.Q. of 70. *Id.* Dr. Doineau noted that Plaintiff's verbal I.Q. fell in the "Borderline range," his performance I.Q. fell in the "Mild range of Mental Retardation," and his full scale I.Q. "averaged out to the low end of Borderline." *Id.* Dr. Doineau noted her belief that Plaintiff's test scores were an "under-estimate of his true ability." *Id.*

Dr. Doineau also administered the Wide Range Achievement Test - Third Edition ("WAIS-III") to Plaintiff. TR 341. Dr. Doineau noted that Plaintiff was "somewhat more motivated" during this test than during the WAIS-R. *Id.* Plaintiff achieved a score of 91 on the reading test and a score of 93 on the spelling test, both of which placed him at the high school level. TR 342.

Dr. Doineau's impressions included Axis I diagnoses of "dysthemia," "anxiety not otherwise specified," "specific phobia, situational type," "cocaine dependence in partial remission," "alcohol dependence in partial remission," and "history of narcotics abuse or dependence." TR 342. Dr. Doineau's Axis II diagnoses were "paranoid and antisocial personality disorder traits" and "borderline intellectual functioning (provisional)." *Id.* Dr. Doineau's Axis III diagnosis was "chronic pain." *Id.*

Dr. Victor Pestrak completed a Mental Residual Functional Capacity Assessment regarding Plaintiff on June 19, 1996. TR 343-346. Dr. Pestrak opined that Plaintiff was

"markedly limited" in his ability to interact appropriately with the general public. TR 344. Dr. Pestrak further opined that Plaintiff was "moderately limited" in his "ability to understand and remember detailed instructions"; his "ability to carry out detailed instructions"; his "ability to maintain attention and concentration for extended periods"; his "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; his "ability to accept instructions and respond appropriately to criticism from supervisors"; his "ability to respond appropriately to changes in the work setting"; and his "ability to set realistic goals or make plans independently of others." TR 343-344. Dr. Pestrak opined that Plaintiff was "not significantly limited" in his "ability to remember locations and work-like procedures"; his "ability to understand and remember very short and simple instructions"; his "ability to carry out very short and simple instructions"; his "ability to sustain an ordinary routine without special supervision"; his "ability to work in coordination with or proximity to others without being distracted by them"; his "ability to make simple work-related decisions"; his "ability to ask simple questions or request assistance"; his "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes"; his "ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness"; his "ability to be aware of normal hazards and take appropriate precautions"; and his "ability to travel in unfamiliar places or use public transportation." *Id.*

Dr. Pestrak also completed a Psychiatric Review Technique form regarding Plaintiff. TR 347-355. Dr. Pestrak noted that an "RFC" assessment was necessary. TR 347. Dr. Pestrak

further noted that this disposition was based on "affective disorders," "mental retardation and autism," and "substance addiction disorders" which were noted to be in partial remission. *Id.* With regard to Plaintiff's substance abuse, Dr. Pestrak noted that Plaintiff's "usage is conflicting but appears to be use of crack 1x week + 12 beers 3x a week." TR 348. Dr. Pestrak noted that Plaintiff demonstrated, "[d]isturbance of mood, accompanied by a full or partial manic or depressive syndrome," as evidenced by "dysthemia" and "anxiety." TR 350. Dr. Pestrak further noted that Plaintiff demonstrated "[s]ignificantly subaverage general intellectual functioning with deficits in adaptive behavior manifested during the developmental period (before age 22), or pervasive developmental disorder characterized by social and significant communicative deficits originating in the developmental period," as evidenced by "probably borderline" intelligence. TR 351. Dr. Pestrak also noted that substance addiction disorders were present, and evaluated these disorders under the category of "affective disorders." TR 353. Dr. Pestrak noted that Plaintiff showed no evidence of a sign or symptom of "organic mental disorders"; "schizophrenic, paranoid and other psychotic disorders"; "anxiety related disorders"; "somatoform disorders"; or "personality disorders." TR 349-353. Dr. Pestrak opined that Plaintiff had a "moderate" degree of limitation in his "Restriction of Activities of Daily Living"; "Difficulties in Maintaining Social Functioning"; and "Deficiencies of Concentration, Persistence or Pace Resulting in Failure to Complete Tasks in a Timely Manner (in work settings or elsewhere)." TR 354. Dr. Pestrak further noted that Plaintiff "once or twice" demonstrated "Episodes of Deterioration or Decompensation in Work or Work-Like Settings Which Cause the Individual to Withdraw from that Situation or to Experience Exacerbation of Signs and Symptoms (which may Include Deterioration of Adaptive Behaviors)." *Id.*

Dr. James H. Threalkill and Dr. Robert Lane conducted a consultative psychological evaluation of Plaintiff on September 30, 1997. TR 434-436. Drs. Threalkill and Lane reported that Plaintiff was "only cooperative to a limited degree during his interview; he gave vague responses to some questions and appeared to have contradicted himself on others; many of his responses do not appear to be congruent with information contained in a report from Deborah E. Doineau, Ed.D." TR 434.

According to the report, Plaintiff stated that he had never experienced hallucinations or delusions, had never attempted suicide or homicide, and had never had a substance abuse problem. TR 434. At first, Plaintiff denied having an arrest record, but later admitted that he had been arrested several times. *Id.* Drs. Threalkill and Lane noted that Plaintiff's employment history was not consistent with Dr. Doineau's report. TR 435.

Drs. Threalkill and Lane further reported that Plaintiff stated that he had experienced excessive anxiety and worry which he found difficult to control, and that he had low self-esteem. TR 435. Plaintiff also reported that he felt "restless" and "keyed up" or "on edge," was "easily fatigued," had "difficulty concentrating," and that "his mind frequently goes blank." *Id.* Plaintiff reported that he was irritable, that his muscles felt tense "most of the time," and that he frequently felt like crying. *Id.* Plaintiff further reported difficulty falling asleep, staying asleep, and he noted that his sleep was restless and unsatisfying. *Id.*

Drs. Threalkill and Lane reported that Plaintiff's long-term memory appeared to be "adequate," and noted that Plaintiff had an adequate ability to name several kinds of items. TR 435. Plaintiff denied any suicidal or homicidal ideation, intent, or plan at the time of his examination. *Id.*

36

During his examination, Plaintiff reported that he woke up at 7:00 a.m., and went to bed by 3:00 a.m. TR 435. Plaintiff stated that he spent most of his day watching television and napping. *Id.* Plaintiff reported that he was able to go grocery shopping, wash dishes, do laundry, vacuum, sweep, and cook. TR 436. Plaintiff also reported that he got along "well" with others, and that he had a "few" friends. *Id.* Plaintiff stated that he did not have a driver's license, and that, other than his mother, he did not have a source of financial support. *Id.*

Drs. Threalkill and Lane opined that Plaintiff was "not significantly limited" in his abilities to understand and remember instructions, to sustain concentration and persistence, to have appropriate social interactions, to travel unaccompanied in unfamiliar places and use public transportation, to set realistic goals, and to make plans independently of others. TR 436. Their Axis I diagnostic impressions were "dysthemic disorder"; "anxiety disorder NOS"; and "R/O malingering." *Id.* No Axis II diagnoses were made. *Id.* Drs. Threalkill and Lane also noted an Axis III impression of "alleges back and leg problems." *Id.*

Dr. Ken Yearick completed a Psychiatric Review Technique form regarding Plaintiff on October 16, 1997. TR 437-445. Dr. Yearick's medical disposition was "Impairment(s) Not Severe," and he based this disposition on "Affective Disorders" and "Anxiety Related Disorders." TR 437. Dr. Yearick noted that Plaintiff had a "disturbance of mood, accompanied by a full or partial manic or depressive syndrome," as evidenced by dysthymia. TR 440. Dr. Yearick also indicated "anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms," as evidenced by "NOS." TR 441. Dr. Yearick noted that Plaintiff showed no evidence of a sign or symptom of "Organic Mental Disorders"; "Schizophrenic, Paranoid and other Psychotic Disorders"; "Mental Retardation and Autism"; "Somatoform

37

Disorders"; "Personality Disorders"; or "Substance Addiction Disorders." TR 439-443.

Dr. Yearick opined that Plaintiff had a "slight" degree of limitation in Restriction of Activities of Daily Living" and "Difficulties in Maintaining Social Functioning." TR 444. Dr. Yearick further opined that Plaintiff "seldom" demonstrated "Deficiencies of Concentration, Persistence or Pace Resulting in Failure to Complete Tasks in a Timely Manner (in work settings or elsewhere)." *Id.* Dr. Yearick also opined that Plaintiff "never" had Episodes of Deterioration or Decompensation in Work or Work-Like Settings Which Cause the Individual to Withdraw from that Situation or to Experience Exacerbation of Signs and Symptoms (which may Include Deterioration of Adaptive Behaviors." *Id.*

Dr. Anna Sarsati conducted a psychological examination of Plaintiff at the Mental Health Cooperative on October 3, 2000. TR 596-597. Plaintiff reported having auditory hallucinations, paranoia, suicidal feelings, and chronic pain. TR 596. Plaintiff told Dr. Sarsati that if he was forced to undergo surgery for his back problem, he would "jump off the thirteenth floor" of his apartment building. *Id.* Plaintiff stated that he had no active substance abuse, but Dr. Sarsati noted that his history was "significant" for tobacco. *Id.* Dr. Sarsati also noted that Plaintiff had "some traffic violations." *Id.* Dr. Sarsati opined that Plaintiff had "marked psychomotor retardation," and further noted that Plaintiff "does not appear to be med-seeking or trying to dramatize current pain." TR 597. Dr. Sarsati's diagnoses included: "[m]ajor depressive disorder with psychotic features," "[r]ule out organicity," and "Current GAF 35/45." *Id.* Dr. Sarsati recommended Zyprexa, Celexa, and Trazodone to Plaintiff. *Id.* She also noted that Plaintiff would continue using Prozac. *Id.*

On November 1, 2000, Michelle Ing, R.N., examined Plaintiff at the Mental Health

Cooperative. TR 598. Plaintiff reported that one of his prior medications, Zyprexa, had been "very helpful [with improving] sleep, mood stability, and paranoia." *Id.* Ms. Ing restarted Plaintiff on Zyprexa. *Id.*

At this point, it should be noted that the above information and records of Dr. Doineau, Dr. Pestrak, Dr. Threalkill, Dr. Lane, and Dr. Yearick, had been submitted to the ALJ in connection with Plaintiff's first hearing on September 19, 1998. It should also be recalled that the Appeals Council had later remanded Plaintiff's claims to the ALJ because his earlier decision had not contained an appropriate evaluation of Plaintiff's mental impairments. TR 169.

Apparently in response to the Order of the Appeals Council, Plaintiff was examined by Patricia Jasnowitz, Ed.D., a "consulting psychologist," on November 10, 2000, who prepared a "DDS Psychological Evaluation." TR 587-594. Dr. Jasnowitz interviewed both Plaintiff and his mother. TR 587. Dr. Jasnowitz noted that Plaintiff had his hand over one eye, and that he told her that he "sees double, sometimes." *Id.* Dr. Jasnowitz commented in her report that Plaintiff was a "poor historian. He was vague, frequently, and appeared to be somewhat evasive." *Id.* Plaintiff reported that he smoked one pack of cigarettes each week, that he used to drink beer, that he last drank beer earlier that year, and that he had never been in any trouble because of alcohol consumption. TR 587-588. Dr. Jasnowitz noted that Plaintiff reported having been arrested for driving without a license and for trespassing, and that he had lost his driver's license because of multiple speeding tickets. TR 588.

Dr. Jasnowitz conducted a series of tests on Plaintiff, including the WAIS-III, the Bender Visual Motor Gestalt Test, and the Rorschach test. TR 589. Dr. Jasnowitz noted that Plaintiff was oriented to person, place, time, and situation, but that he maintained poor eye contact. *Id.*

Dr. Jasnowitz further noted that Plaintiff made numerous comments about the number of tasks to be completed, the temperature in the room, his vision, his blood sugar levels, and his ability to perform certain tasks. *Id.* Plaintiff reported that he had thought about "shooting himself in the head" in the past, but that he had not attempted to harm himself, and that he had not experienced auditory or visual hallucinations. *Id.* Dr. Jasnowitz noted that Plaintiff's "mood was euthymic," his "affect was mood congruent," his "insight is limited," and his "judgment appears to be fair." *Id.*

Plaintiff told Dr. Jasnowitz that he did not have knowledge of current events, but he subsequently demonstrated knowledge of the win/loss record of the Titans football team. TR 589. Plaitniff stated that he did his household chores, and that he liked to play bingo and board games with friends. *Id.* Dr. Jasnowitz noted that Plaintiff performed in the "extremely low" range of intellectual functioning, and that Plaintiff's verbal skills "were significantly better developed" than his performance skills. *Id.*

Plaintiff's WAIS-III scores were a verbal I.Q. of 74, a performance I.Q. of 63, and a full scale I.Q. of 66. TR 589. Dr. Jasnowitz noted, however, that Plaintiff took pain medication in the middle of his WAIS-III test and complained of various physical symptoms. *Id.* For these reasons, Dr. Jasnowitz noted that the results were considered to be invalid. *Id.* Dr. Jasnowitz reported that Plaintiff appeared to be of "low average to average" intellectual functioning. *Id.*

Dr. Jasnowitz also administered the Bender Gestalt test to Plaintiff and noted that Plaintiff exhibited "adequate" visual motor integration. TR 590. Based on Plaintiff's Rorschach test performance, Dr. Jasnowitz noted that Plaintiff did not exhibit disordered thinking. *Id.*

Dr. Jasnowitz made numerous diagnoses. TR 590. Dr. Jasnowitz's Axis I diagnoses

were: "Anxiety Disorder Not Otherwise Specified," "History of Adult Antisocial Behavior," and "Rule Out By Report 249.9 Cognitive Disorder Not Otherwise Specified." *Id.* Dr. Jasnowitz did not make an Axis II diagnosis, and she deferred to Plaintiff's medical report in lieu of making an Axis III diagnosis. *Id.* Dr. Jasnowitz's Axis IV diagnosis was, "Report of Pain, Report of Mother Providing Total Financial Support." *Id.* Dr. Jasnowitz's Axis V diagnosis was "Current Level of Adaptive Functioning: 60-70." *Id.*

Dr. Jasnowitz opined that Plaintiff was "[m]oderately [l]imited" in his "Ability to Understand and Remember," his "Sustained Concentration and Persistence," and his "Ability to Adapt/Tolerate Stress Associated with Day to Day Activity." TR 590. Dr. Jasnowitz further opined that Plaintiff was "[n]ot [s]ignificantly [l]imited" in his social interaction skills. *Id.*

Dr. Jasnowitz also completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental).[26] TR 593-594. Dr. Jasnowitz opined that Plaintiff's ability to understand, remember, and carry out instructions was affected by his mental impairment. TR 593. Dr. Jasnowitz further stated that Plaintiff had a "good" ability to: understand and remember short, simple instructions; carry out short, simple instructions; and remember locations and work-like procedures.[27] *Id.* Dr. Jasnowitz noted that Plaintiff had a "fair" ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular

---

[26]This form appears to be a standard Social Security Administration form. It begins by stating, "To assist us in determining this individual's ability to do work-related activities, please give us your professional opinion of what the individual can still do despite his/her impairment(s)." TR 593 (underlining in original).

[27]The Statement defines "good" as follows: "The individual can perform the activity satisfactorily most of the time." TR 593.

attendance, and be punctual; sustain an ordinary routine without special supervision; work with or near others without being distracted by them; make simple work-related decisions; complete a normal workday or workweek, and perform at a consistent pace.[28]  *Id.*  Dr. Jasnowitz opined that Plaintiff's ability to respond appropriately to supervision, co-workers, and work pressures in a work setting were affected by his mental impairment.  TR 594.  Dr. Jasnowitz further opined that Plaintiff had an "excellent" ability to: ask simple questions or request assistance; adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation.  *Id.*  Dr. Jasnowitz noted that Plaintiff had a "good" ability to interact appropriately with the public.  *Id.*  Dr. Jasnowitz further noted that Plaintiff had a "fair" ability to: accept instructions and respond appropriately to criticism from supervisors; get along with co-workers and peers; maintain socially appropriate behavior; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.  *Id.*

## B.  September 10, 1998 Hearing

### 1.  Plaintiff's Testimony

Plaintiff was born on November 1, 1962, and has a high school education.  TR 44; 46.

Plaintiff testified that he was not then married, and that he had never been married.  TR 44.  Plaintiff reported that he lived alone, and that his mother paid his rent.  TR 45.  Plaintiff added that he received food stamps that valued $122 per month.  *Id.*

---

[28]The Statement defines "fair" as follows: "The individual can perform the activity satisfactorily some of the time."  TR 593.

Plaintiff testified that he was 5 feet, 11 inches tall, and that he weighed 325 pounds. TR 45. Plaintiff reported that since he stopped working in 1993, he had gained between 50 and 60 pounds. *Id.* Plaintiff stated that he had gained weight because he could not be as active as he used to be. TR 45-46.

Plaintiff testified that he was left-handed. TR 46. Plaintiff also stated that he graduated from high school and did not receive any vocational training. *Id.* Plaintiff added that when he was in high school, he attended regular courses. *Id.* Plaintiff reported that he had not completed military service. *Id.*

Plaintiff testified that his disability was triggered by an accident in a shipyard in Connecticut either on July 10, 1993 or at some time before that. TR 46. Plaintiff stated that he thought this accident was the cause of his knee injury because the doctor who operated on his knee had told him that the injury in Plaintiff's knee was "an old injury." *Id.* Plaintiff testified that he tried to work after his accident. TR 47. Plaintiff stated that his last job was at the shipyard, and that his employer was General Dynamics. *Id.* Plaintiff testified that he worked as a rigger, and that as a rigger he had to "tie ropes," "hook chain balls," and do "a lot of heavy lifting." *Id.*

Plaintiff testified that he started working for General Dynamics in 1988 or 1989, and that he thought he got injured in January 1990. TR 47. Plaintiff testified that he had worker's compensation, and that he settled the case for $41,000. TR 48. Plaintiff reported that his mother used the money and that none of it remained. *Id.*

Plaintiff testified that he filed multiple applications for Social Security benefits because he was not aware that he could appeal the denial of his applications. TR 48. Plaintiff reported

that the current hearing was the first time he had appeared before a judge. *Id.*

Plaintiff testified that prior to working in the shipyard and working for General Dynamics, he held various labor jobs. TR 48-49. Plaintiff reported that since leaving General Dynamics, he had attempted to work, but that he had problems with his "head." TR 49. Plaintiff also reported not getting along with his boss when he worked as a dietician for eight or nine months at "Mahair." *Id.* Plaintiff explained that he went drinking because his employer had given him the day off, but then his employer called him into work and fired him when she smelled his breath. *Id.* Plaintiff stated that he had trouble climbing the stairs at Mahair, but that, other than the stairs and his problems with his boss, he had no other difficulty at work. TR 50.

Plaintiff testified that he stopped drinking alcohol after a surgeon told him that he would not heal properly if he continued drinking. TR 50. Plaintiff added that he could no longer afford to purchase alcohol. *Id.* Plaintiff reported that he used to drink a six pack of beer each day, but that currently he only drank a beer once every three months. *Id.* Plaintiff added that he thought he had had an alcohol problem in the past. *Id.* Plaintiff said that, in June 1996, he had been drinking a 12-pack of beer three times each week. TR 50-51. Plaintiff stated that he did not seek rehabilitation for his drinking because, at the time, he did not think that he had a problem, but that he thought the people he was around did. TR 51.

Plaintiff testified that he had tried drugs "a long time ago," but that he only tried drugs when he did not have to pay for them. TR 51. Plaintiff added that he tried to sell drugs, but that "it didn't work." *Id.*

Plaintiff testified that he smoked a pack of cigarettes each week and that he had cut back on smoking because of his asthma. TR 51.

44

Plaintiff testified that alcohol cost him his job at Mahair, but that he had never had prior problems with alcohol and his jobs.  TR 51.

Plaintiff testified that, "I'm just in pain all the time," and that he experienced a burning sensation while sitting down.  TR 52.  Plaintiff explained that he felt pain in the back of his legs, his entire right side, and his lower back.  *Id.*  Plaintiff reported that he was going to get x-rays later that day to further identify the cause of his pain.  *Id.*  Plaintiff also testified that he liked to sleep on his right side, but that he would lie on his left side when he was home.  *Id.*  Plaintiff reported that his right foot was often swollen, and that his right big toe would also swell.  *Id.*  Plaintiff stated that he used to try and get up and walk when his foot was swollen, but that Dr. Hobbs told him that walking would not help his foot.  *Id.*  Plaintiff stated that he did not know whether his diabetes caused the swelling in his feet, but reported that he was starting to get blisters on his feet.  *Id.*

Plaintiff testified that he fell when he was in the hatch of a boat at a shipyard and that he fell to the bottom of the boat.  TR 52-53.  Plaintiff added that "something" had hit him on the head and "knocked [him] through the boat."  TR 53.  Plaintiff reported that he suspected that his injury was not accidental because he had crossed a picket line at work.  *Id.*

Plaintiff reported that after his accident at the shipyard, he hurt his right shoulder, lower back, and right side.  TR 53.  Plaintiff added that these injuries did not heal.  *Id.*  Plaintiff stated that his right shoulder "jumps when it wants to" and that it "aches all the time."  *Id.*

Plaintiff stated that he had surgery on his right knee in March 1997.  TR 53-54.  Plaintiff speculated that his knee surgery was necessitated by his "other" injury (presumably the fall at the shipyard) because his doctor had told him that his knee injury appeared to be quite old.  TR 54.

45

Plaintiff testified that he told his doctor that he had tried to bear the pain, but that one night, he was out with a friend and his leg "gave completely out." *Id.*

Plaintiff testified that when he had to get x-rays or have a major procedure done, he went to Dr. Emerson, but that his primary doctors were Drs. Griner[29] and Hobbs. TR 54. Plaintiff testified that he went to see Dr. Griner whenever he was in pain. *Id.* Plaintiff added that he took medicine for the swelling in his leg, but that Dr. Griner could tell when Plaintiff had been using his leg too much. *Id.*

Plaintiff testified that he experienced his then current symptoms when he was working at Mahair, but that it "wasn't that bad." TR 54-55. Plaintiff explained that the only thing that bothered him at Mahair was his right shoulder, which would swell. TR 55. Plaintiff reported that he told his boss that he might not be able to keep his job at Mahair, and that he was not sure of the dates when he worked at Mahair. *Id.*

Plaintiff testified that he had not seen Dr. Emerson for "a while," and that the last time he saw Dr. Emerson was when Dr. Emerson wrote him a note to get food stamps. TR 55. Plaintiff added that he thought that this last meeting took place two or three months prior to the hearing. *Id.* Plaintiff reported that he wanted to go back to Dr. Emerson, but that he had to go to his primary care provider first. *Id.*

Plaintiff testified that he told his doctors that he went through stages where he did nothing and had "bad thoughts." TR 55-56. Plaintiff added that he "used to be happy," but that he was not happy anymore. TR 56. Plaintiff reported that he mentioned his feelings to Dr. Hobbs on three to five occasions, but that he did not think that Dr. Hobbs cared much about

_____

[29]The hearing transcript incorrectly refers to Dr. Griner as Dr. Grannon.

these feelings.  *Id.*  Plaintiff added that Dr. Hobbs was his primary doctor.  *Id.*

Plaintiff testified that he had used cocaine, but that it "was a long time ago."  TR 56. Plaintiff added that he had gone to vocational rehabilitation, and that it was "the worst thing I ever did in my life."  TR 57.  Plaintiff explained that he went to vocational rehabilitation for two or three weeks, and that when he was there, he looked in the newspaper for jobs.  *Id.*  Plaintiff testified that he took a job as a telemarketer in order to get bonus money.  *Id.*  Plaintiff stated that being a telemarketer was "terrible."  *Id.*

Plaintiff reported that he did not drive a car because his driver's license was suspended or revoked.  TR 57-58.  Plaintiff explained that he had gone to Connecticut, that his license had expired, and that he had not renewed it.  TR 58.  Plaintiff further explained that, as a result, he received tickets for driving on a suspended license.  *Id.*  Plaintiff explained that he could get a new driver's license if he wanted one, but that he did not have the money to do so.  *Id.*  Plaintiff testified that he did not drive.  TR 59.  Plaintiff further testified that he had received a speeding ticket, but that he had never had a DUI or "anything like that."  *Id.*

Plaintiff reported that his son's mother had falsely accused him of rape as a result of an argument they had.  TR 59.  Plaintiff reported that this incident was still on his criminal record even though he said it did not happen.  *Id.*

Plaintiff reported that he did his "best" to keep his apartment clean, and that he shopped for food either alone or with his mother.  TR 60.  Plaintiff reported that he had "plenty of hobbies," and that he used to be an outgoing person, but that he could not go anywhere anymore. *Id.*  Plaintiff added that he would like to do more activities with his child, but that he could not afford to.  *Id.*

Plaintiff reported that he did not see his son as much as he used to because he felt that he could not do things for his son. TR 60. Plaintiff added that his son's mother "isn't any good." *Id.* Plaintiff reported that his son would turn 16 years old the following October, and that he lived in Nashville. TR 60-61. Plaintiff added that, at the time of the hearing, he had not seen his son in "about two months." TR 61.

Plaintiff testified that he had a friend who gave him football tickets and with whom he went to get milkshakes. TR 61. Plaintiff explained that his friend would take him to a football game when the friend had an extra ticket. *Id.*

Plaintiff reported that he used to walk for exercise, but that walking made his foot swell. TR 61. Plaintiff added that he tried to walk around Centennial Park to lose weight, but that he could no longer do that. TR 61-62. Plaintiff added that he did not have trouble walking unless he was walking up a hill. TR 62. Plaintiff added that his doctor told him to lose weight, but that it was difficult for him to do so because of his limitations. *Id.*

Plaintiff testified that he typically woke up around 7:00 a.m., watched television for a few hours, and then took a nap. TR 62. Plaintiff stated that after his nap, he usually spent time with a friend who lived in the building and watched television at his apartment. TR 62-63. Plaintiff stated that he watched five or six hours of television per day, and perhaps "a lot more than that." TR 63. Plaintiff added that he also listened to music. *Id.*

Plaintiff stated that if he was able to work, he would be glad to do so. TR 63. Plaintiff added that a friend of his was receiving monthly checks, and that he did not want to be like his friend, but that he would be willing to accept such aid until he could do something better. *Id.*

Plaintiff testified that, "I can just eat all day," and that he started eating when he started

48

feeling bad. TR 63. Plaintiff added that he filled out a form that listed all of his medicines. TR 64. Plaintiff testified that he did not experience side effects from his medications, but that his condition worsened if he did not take them. *Id.* Plaintiff added that he took a pill to manage his diabetes, but that he thought that his diabetes was getting worse. *Id.* Plaintiff added that he took Tresitone to help him sleep, but that it did not work. TR 65. Plaintiff added that he went to sleep when his pain worsened. *Id.*

Plaintiff stated that when he was awake, he tried to get comfortable to ease his pain. TR 65. Plaintiff testified that he also had problems with cramps, and that Dr. Emerson told him that the cramps might be the result of poor circulation. *Id.* Plaintiff explained that he mainly got cramps in the back of his thigh, and that he did not have to be walking for the cramps to be "bad." *Id.* Plaintiff added that he also experienced the cramps while sitting. *Id.* Plaintiff stated that moving "properly" helped the blood flow. *Id.*

Plaintiff testified that he could sit for about ten minutes at a time, but that how long he was able to sit varied based upon the type of chair he was sitting in at the time. TR 66. Plaintiff said that he could stand as long as he had something to lean on. *Id.* Plaintiff stated that if he did not have something to lean on, his foot started burning. *Id.* Plaintiff testified that he had been told to try not to lift anything over 20 pounds. *Id.* Plaintiff reported that he could bend "somewhat," and that he could not climb up stairs. *Id.* Plaintiff added that he did not squat or kneel "too much," and that he tried not to use his right shoulder. *Id.* Plaintiff stated that he could hold and grip things. *Id.*

Plaintiff reported that on the morning of the hearing, he had a burning sensation in his back. TR 67. Plaintiff stated that he did not know what was wrong with his leg, but that "they"

told him that it was just a "minor nerve problem." *Id.* Plaintiff stated that the pain in his leg had been present since he had had his operation. TR 67-68. Plaintiff added that Dr. Hobbs seemed to think that his problems were being caused by diabetes. TR 68. Plaintiff stated that Dr. Hobbs had not yet seen the blisters that had started to form on Plaintiff's feet. *Id.*

Plaintiff testified that he had been denied jobs that he had applied for because of his prior injuries. TR 69.

## 2. Vocational Testimony

Vocational expert ("VE"), Rebecca Williams, also testified at Plaintiff's hearing. TR 69-77.

The VE began her testimony by asking questions of Plaintiff regarding his past work. TR 69-70. Plaintiff stated that he worked for "MDHA" for two years, that he had worked there within the past 15 years, and that he was a "regular maintenance worker." *Id.* Plaintiff added that he worked with a landscaping crew for "about three months." TR 70. The VE stated that there was something in the record about Plaintiff having worked as a street cleaner, but Plaintiff stated that this was a temporary job that he held when he was 17 or 18 years old. TR 70-71. Plaintiff added that jumping off the back of the trash truck had created a problem for his leg. TR 71.

The VE testified that Plaintiff's past relevant work as a maintenance worker was medium and unskilled, that Plaintiff's past relevant work as a rigger was very heavy and semi-skilled, that Plaintiff's past relevant work as a dietary aide was medium and unskilled, that Plaintiff's past relevant work as a lawn care worker was medium and unskilled, and that Plaintiff's odd jobs

through temporary agencies ranged from light and unskilled to heavy and unskilled. TR 71.

The VE testified that some of Plaintiff's skills would transfer to medium work. TR 72. The VE stated, however, that she was envisioning work on a crane, and Plaintiff added that he did not work on a crane. *Id.* The VE stated that Plaintiff's skills transferred into medium jobs such as overhead crane operator. *Id.*

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff and based on the assessment made by Dr. Campbell (TR 326-329). TR 72. The ALJ then asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. TR 73. The VE answered that the hypothetical claimant would not be able to perform any of Plaintiff's past relevant work. *Id.* The VE explained that it was rare that a medium job offered a true sit/stand option, but that several jobs at the light level offered such an option. *Id.*

The VE opined that in the State of Tennessee, there are approximately 4,000 machine operator jobs, 1,300 assembly jobs, and 700 production inspection jobs, all of which were classified as light work and all of which would be appropriate for the hypothetical claimant. TR 74. In addition to the aforementioned light work positions, the VE testified that there are numerous other sedentary positions that would be appropriate for the hypothetical claimant, including 2,000 cashier jobs, 1,000 teacher aide jobs, 4,000 assembly jobs, 700 inspector jobs, and 1,100 general laborer jobs. *Id.*

The ALJ next presented the VE with a hypothetical situation paralleling that of Plaintiff and based on the assessment made by Dr. Emerson (TR 446-448). TR 74. The ALJ then asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. *Id.* The VE answered that the hypothetical claimant would not be able to perform any of

Plaintiff's past relevant work.  *Id.*

The VE testified that all of the jobs that she had identified under the previous hypothetical as being available to that hypothetical claimant would be available to this hypothetical claimant as well.  TR 74.  The VE further opined that in the State of Tennessee, there are also approximately 300 receptionist jobs, 200 information clerk jobs, 600 messenger jobs, 1,000 additional teacher aide jobs, and 900 additional assembly jobs, all of which would be appropriate for the hypothetical claimant.  TR 74-75.

The ALJ then presented the VE with a hypothetical situation paralleling that of Plaintiff and based on the evaluation performed by Drs. Threalkill and Lane (TR 434-436).  TR 75-76. The ALJ then asked if these additional limitations would impact the number of jobs cited as available to Plaintiff.  TR 76.  The ALJ asked the VE if this hypothetical "is a negative as far as any limitations, you didn't hear any did you?"  TR 76.  The VE responded "no."  *Id.*

The ALJ next presented the VE with the evidence from Dr. Doineau's evaluation of Plaintiff (TR 338-342) and asked whether these additional limitations would impact the number of jobs available.  TR 76.  The VE responded that she did not think that these limitations would impact the number of jobs cited as available, and added that Dr. Doineau opined that Plaintiff's test scores from this evaluation were an underestimate of his true abilities.  *Id.*

## C.  December 12, 2000 Hearing

### 1.  Plaintiff's Testimony

Plaintiff reiterated his testimony from the previous hearing regarding his age and educational background.  TR 81-82.

Plaintiff stated that he last worked in 1996 or 1997, and that it was at this job where he injured his leg while cutting grass. TR 82. Plaintiff reported that he first started experiencing back pain about 10 years previously when he got knocked off a boat. *Id.* Plaintiff stated that the pain had become "worse and worse," and that he had nerve damage. *Id.* Plaintiff added that his leg "wiggles," and that sometimes he did not know when his leg was "wiggling" because of the nerve damage. TR 82-83. Plaintiff stated that he also had pain in his lower back, and that if his right leg "touches this chair" while he was sitting down, he felt pain up his back, down his leg, and into his left shoulder. TR 83. Plaintiff added that standing, walking, bending, and lifting all exacerbated his pain. *Id.* Plaintiff added that his weight had dropped from 340 pounds to 296 pounds, but that the pain in his back had not gone away. *Id.* Plaintiff reported that he could not sit in a chair for longer than five or 10 minutes without feeling pain. *Id.* He added that when he was home, he normally had one leg propped up or he would lie down. *Id.*

Plaintiff testified that when he stood, he usually leaned on something, and that he could not stand for longer than five or 10 minutes. TR 84. Plaintiff added that he felt pain in his lower back when he walked. *Id.* Plaintiff added that walking uphill gave him breathing problems, and that he tried to walk as little as possible. *Id.* Plaintiff stated that he did not walk on a flat surface for longer than 10 minutes because he knew that his back would start hurting. *Id.*

Plaintiff testified that when he went to the grocery store, he needed help in putting his groceries in his cart, and that he had someone help him with the groceries when he got home. TR 84. Plaintiff added that picking up a gallon of milk aggravated his lower back. *Id.*

Plaintiff testified that he usually stayed in bed to relieve his pain. TR 84-85. Plaintiff added that he took medication, but that it did not always work. TR 85. Plaintiff stated that lying

down was the only way that he could get his pain to stop, but that sometimes even lying down did not help the pain. *Id.*

Plaintiff reported that he had some problems with anxiety, and that he got nervous because he felt that the people in his building were watching him. TR 85. Plaintiff added that he tried to stay away from people, and that doing this made him "better." *Id.* Plaintiff reported that he was starting to have memory problems. *Id.* Plaintiff added that sometimes his pain was "so bad" that he wanted to "jump off of the building." TR 85-86. Plaintiff reported that he had told the "mental health corp. lady" [*sic*] that if his pain ever got as bad as it got a month prior to the hearing, that he would "probably" kill himself. TR 86.

Plaintiff testified that he had problems concentrating. TR 86. Plaintiff added that the hearing made him nervous, and that he was starting to feel that he did not belong around people. *Id.* Plaintiff stated that he felt as though he was easily distracted. *Id.*

Plaintiff testified that on a typical day, he got up around 9:00 a.m., ate a bowl of cereal, and then "look[ed] out the window." TR 86. He added that at around 10:00 a.m., he would watch television, and then he would take his medication. TR 87. Plaintiff added that he usually returned to bed and watched television. *Id.* Plaintiff stated that he would like to ride the bus and go to the city, but that he could not afford it. *Id.* Plaintiff testified that he spent between eight and 10 hours in bed each day. *Id.* Plaintiff added that the main reason that he spent so much time in bed was because of the pain in his legs and back. *Id.*

Plaintiff testified that another person who lived in his building helped with his chores. TR 87-88. Plaintiff added that he washed his dishes and that he used to cook, but that he did not cook anymore because he burned himself and his food. TR 88.

Plaintiff testified that he did not drive.  TR 88.  Plaintiff added that he liked to watch sporting events and that people from Vanderbilt[30] sometimes gave him tickets to football and basketball games.  *Id.*  Plaintiff reported that he had problems attending sporting events because he wanted to sit where no one else was sitting, and that this annoyed his friend John.  *Id.*  Plaintiff added that he felt that he should not sit next to John because his clothes were not as clean as John's.  *Id.*

Plaintiff testified that he experienced side effects as a result of his medication, including trouble sleeping, trouble going to the bathroom, and tooth pain.  TR 89.  Plaintiff added that his diabetes caused him problems, such as incontinence, altered blood pressure, and watery eyes.  *Id.*  Plaintiff added that he thought that he needed glasses, but that his insurance would not cover them.

Plaintiff then reiterated the explanation for why he did not drive.  TR 90.

Plaintiff testified that the Mental Health Cooperative came to see him twice each month, and added that his caregiver had been checking on him more often recently.  TR 90.  Plaintiff added that his caregiver's name was Audrey, and that she lived in his building.  *Id.*  Plaintiff reported that when he was feeling bad, he went to see her.  *Id.*  Plaintiff stated that the other people at the Mental Health Cooperative would not help him and that they made fun of him.  TR 91.

**2.  Vocational Testimony**

Vocational expert ("VE"), Deborah Rice, also testified at Plaintiff's hearing.  TR 91.

---

[30]The hearing transcript incorrectly refers to Vanderbilt as Vanderville.

The ALJ read to the VE the findings of the VE in the previous hearing regarding the classification of Plaintiff's past relevant work. TR 91. The VE agreed that all of the classifications in the previous hearing were correct. *Id.*

The VE then asked questions of Plaintiff regarding his educational background. TR 92. Plaintiff testified that he attended "Austin" University, explaining that "I was on the street and the football coach came by and he picked me up." *Id.* Plaintiff reported that he played football for the university under an assumed name, and that he played for one year. *Id.* Plaintiff testified that he did not attend class, and that he thought that he had played four games. TR 93.

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff and asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. TR 93-94. The VE answered that the hypothetical claimant's Global Assessment of Functioning ("GAF") score range of 35-45 would preclude all work. TR 94. The VE added that a GAF score range of 60-70 would not preclude Plaintiff from light work, but that he would be precluded from performing all of his relevant past work. *Id.*

The VE opined that in the State of Tennessee, there are approximately 3,200 assembler jobs, 500 surveillance system monitor jobs, and 800 inspector jobs, all of which would be appropriate for the hypothetical claimant. TR 95. The VE opined that at the national level, there are approximately 103,000 assembler jobs, 4,500 surveillance system manager jobs, and 1,400 inspector jobs that would likewise be appropriate for the hypothetical claimant. *Id.*

The ALJ then modified the hypothetical by reiterating Plaintiff's ability to "understand and remember," his ability to concentrate, and his ability to adapt to and tolerate stress. TR 95. The VE responded that these additional limitations would still allow performance of the jobs she

identified as being appropriate for the hypothetical claimant.  *Id.*

The ALJ next asked about the limitations set forth by Dr. Jasnowitz in her Medical Source Statement (TR 593-594), and asked whether these additional limitations would allow the performance of the jobs the VE had identified.  TR 95-96.  The VE replied that these limitations would not impact the hypothetical claimant's ability to perform the jobs she mentioned.  TR 96.

The ALJ next reiterated the limitations set forth by Dr. Emerson in his Medical Source Statement (Physical) (TR 560-565) and asked the VE whether these additional limitations would allow the performance of the jobs the VE had identified.  TR 97.  The VE replied that these limitations would not impact the hypothetical claimant's ability to perform the jobs she mentioned.  *Id.*

The ALJ then reiterated the limitations set forth by Dr. Hobbs regarding Plaintiff's physical capacity (TR 524-527) and asked the VE whether the restrictions set forth by Dr. Hobbs were consistent with full time work.  TR 97.  The VE replied that those limitations were not consistent with full time work.  *Id.*

The ALJ referenced the Residual Functional Capacity form completed by Dr. Pestrak (TR 343-346), and stated the limitations included therein.  TR 97-98.  The ALJ then asked the VE whether those limitations would allow for the performance of the jobs that the VE identified as available.  TR 98.  The VE replied, "not in a moderate level, no."[31]  *Id.*  The VE also replied

---

[31]The VE's testimony is unclear at this point.  When the ALJ asked whether the limitations listed by Dr. Pestrak would allow the performance of the jobs that the VE listed, the VE's response was "no."  TR 98.  The VE's comments about the social interaction required by the jobs, however, indicates that she believed that Plaintiff could complete these jobs with his limitations.  It is possible that the confusion exists because this question was structured differently than the ALJ's other questions.

57

that Plaintiff's marked limitations in his ability to interact with the general public would not be an issue because the jobs she listed required "very minimal" social interaction. *Id.*

Plaintiff's attorney cross-examined the VE after the ALJ questioned the VE.[32] TR 98. Plaintiff's attorney referenced another assessment completed by Dr. Hobbs (TR 481-483), and asked whether the limitations set forth by Dr. Hobbs in this evaluation would preclude the hypothetical claimant from work. TR 98. The VE replied that these limitations would preclude the hypothetical claimant from working. TR 99.

Plaintiff's attorney then asked about the limitations set forth by Dr. Jasnowitz (TR 587-594) and whether Plaintiff could work if he could only perform certain tasks some of the time. TR 99. The VE replied that when a person is rated as "fair" in several categories on an assessment, the person's performance of work is affected. *Id.* The VE said that a person's ability to work greatly varies depending on how many times "fair" is checked on an assessment. *Id.*

The ALJ next asked the VE if the hypothetical claimant could work if, based on the assessment by Dr. Jasnowitz, he could only "complete a work day some of the time." TR 99. The VE responded that such a limitation would not really allow for any work. *Id.* Plaintiff's attorney proceeded to list other activities that, according to Dr. Jasnowitz, Plaintiff could only perform "some of the time." TR 99-100.[33] Plaintiff's attorney then asked if this assessment by

---

[32]The heading for this section of the hearing transcript is "Examination of Claimant by Attorney," but this dialogue clearly involves the VE, not Plaintiff.

[33]Page 100 of the record was not included in the original record. Page 100 was submitted as an attachment to Docket Entry No. 15, whereas the rest of the record is an attachment to Docket Entry No. 11.

Dr. Jasnowitz would preclude work. TR 100. After asking for, and receiving, an explanation of what "some of the time" meant, the VE stated that Plaintiff would not be able to sustain full time employment under the limitations set forth by Dr. Jasnowitz. *Id.*

The VE testified that if Plaintiff's testimony were found credible, there would be no work that Plaintiff could perform. TR 100. Specifically, the VE stated that this conclusion was based upon the "some of the time" designations by Dr. Jasnowitz and Plaintiff's decreased range of motion to his lower extremities. *Id.* The VE added that Plaintiff "would need a sit/stand option." TR 101.

### III. CONCLUSIONS OF LAW

#### A. Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

59

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which

60

Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[34] or its equivalent. If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations). By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> (5) Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added). *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by

---

[34]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).


## C. Plaintiff's Statement Of Errors

Plaintiff argues that the ALJ erred by giving weight to Dr. Jasnowitz's November 10, 2000 evaluation of Plaintiff, but rejecting her November 10, 2000 Medical Source Statement. Docket Entry No. 14.

Plaintiff further argues that he is disabled and entitled to an immediate award of benefits. *Id.* Plaintiff argues in the alternative to being awarded benefits, that, pursuant to sentence four of 42 U.S.C. § 405(g), the case be remanded for further consideration in order to clarify Plaintiff's mental impairments. Docket Entry No. 14.

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

As has been noted, Plaintiff seeks reversal and an immediate award of benefits. Docket Entry No. 14. "In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

As an initial matter, the undersigned cannot, as a matter of law, conclude at this time that the record adequately establishes Plaintiff's entitlement to benefits. Although Plaintiff contends that all factual issues have been resolved, factual issues indeed remain regarding Plaintiff's mental impairments. Because all essential factual issues have not been resolved and there is no clear entitlement to benefits on the record as it now stands, the record does not merit the immediate award of benefits to Plaintiff.

Plaintiff argues in the alternative that this case be remanded for further consideration. Docket Entry No. 14.

The ALJ has a duty to "fully and fairly develop the administrative record," and where the

63

evidence suggests that a claimant may well meet a listed impairment, the ALJ must develop the evidence in order to determine whether the listing is met. *Johnson v. Secretary*, 794 F.2d 1106, 1111 (6th Cir. 1986). In doing so, the ALJ must identify the reasons and basis for crediting or rejecting certain items of evidence (*see, e.g., Morehead Marine Services v. Washnock*, 135 F.3d 366, 375 (6th Cir. 1998); *Hurst*, 753 F.2d at 519), as there can be no meaningful judicial review without an adequate explanation of the factual and legal basis for the ALJ's decision (*Hyatt Corp. v. N.L.R.B.*, 939 F.2d 361, 367 (1991)).

Moreover, in view of the remand by the Appeals Council, the ALJ had the specific duty in this case to develop the record concerning an evaluation of the claimant's mental impairments. In remanding the case, the Appeals Council obviously had determined that the evaluations and examinations conducted by Dr. Doineau, Dr. Pestrak, Dr. Threalkill, Dr. Lane, and Dr. Yearick, all conducted between 1996 and 1997, did not contain sufficient evaluations of Plaintiff's mental impairments. It was, therefore, incumbent upon the ALJ to develop the record in this area.

Thus, the Court would have expected the ALJ to rely heavily upon the additional examinations and reports conducted in 2000, namely those of Dr. Sarsati and Dr. Jasnowitz. But in a section of his decision entitled, "The Weights Assigned To The Mental Assessments," the ALJ stated in pertinent part as follows:

> Dr. Jasnowitz's report included analysis of Dr. Lane's report, whose report, in turn, included analysis of Dr. Doineau's report. Also, her finding that the claimant had no limitations with social interaction are supported by the claimant's testimony that he went to college football games when he had free tickets and by his statements that he like [*sic*] to play bingo and board games with friends. Dr. Jasnowitz's GAF score [60-70] and her associated findings of the claimant's limitations are given substantial weight.

64

Dr. Jasnowitz's accompanying assessment, however, is given no weight, because the definitions of "good" and "fair" are poorly defined and because they are not consistent with her GAF score that she assigned or the associated findings that she found.

The assessment of Drs. Doineau and Lane are given somewhat less weight, but neither is substantially different from Dr. Jasnowitz' [*sic*] assessment.

Dr. Sarsati's GAF score [35-45] is given no weight because the claimant reported symptoms that he did <u>not</u> report to Drs. Jasnowitz, Lane and Doineau, and because he also made statements that were contradictory to the ones he made to the other psychologists, and because her examination was 2 hours <u>shorter</u> than the one by Dr. Jasnowitz.

TR 30 (underlining in original).

In his findings, the ALJ further stated:

The claimant can perform a light level of work with allowances [*sic*] for the ability to sit or stand at will and for avoiding any kneeling or crawling. Regarding his mental impairments, the claimant has **mild** restrictions in his activities of daily living, **no** limitations in maintaining social functioning, **mild to moderate** difficulties in maintaining concentration, persistence, or pace, and **no** episodes of decompensation that were of extended duration. 20 CFR §§ 404.45 and 416.945.

TR 33 (bold in original).

The undersigned concludes that there are a number of problems with the ALJ's statement and analysis quoted above.

First, the ALJ apparently adopted those portions of Dr. Jasnowitz's reports that supported his conclusion (her evaluation) and he discounted those that did not (her assessment). His primary explanation for giving no weight to her assessment was that "the definitions of 'good' and 'fair' are poorly defined... ." TR 30. Even if that were the case, however, Plaintiff cannot be held responsible for inadequacies in the form Dr. Jasnowitz was given to complete concerning

65

Plaintiff. As discussed above, the ALJ has the duty to fully and fairly develop the record, particularly in view of the remand in this case. If the form was inadequate, the ALJ should not have required Dr. Jasnowitz to complete it. Additionally, the Court notes that Dr. Jasnowitz apparently was not asked to complete a Mental Residual Functional Capacity Assessment, which might have provided clearer information to the ALJ.

The ALJ also stated that the definitions of "good" and "fair" "are not consistent with her GAF score ... ." The ALJ, however, provides no explanation for that conclusion.

Second, Dr. Jasnowitz's evaluation seems somewhat untrustworthy in two significant respects. The evaluation begins with the statement, "Mr. Parrish is a 38-year-old African American male who has applied for disability benefits based on allegations of 'memory.'" TR 587. The evaluation concludes with the statement, "It is my impression that Mr. Parrish is cognitively capable of managing his finances." TR 592. Approximately one month before Dr. Jasnowitz evaluated Plaintiff, however, Plaintiff had told Dr. Sarsati that he was hearing voices, was paranoid, was intermittently suicidal, and that he felt "that sometimes he cannot cope with the pain." TR 596. Clearly Plaintiff was having problems with more than just "memory."[35] Additionally, Dr. Jasnowitz's statement concerning Plaintiff's ability to manage his finances is equally puzzling. Given these statements, it is unclear at best whether Dr. Jasnowitz understood why she was being asked to evaluate Plaintiff.

Third, and perhaps more importantly, her evaluation states in part as follows:

> Mr. Parrish said that on his best days, which occur "sometimes,"
> he feels "happy and listens to music." *Mr. Parrish did not*

---

[35]It does not appear that Dr. Jasnowitz was aware of the written initial assessment performed by Dr. Sarsati approximately one month earlier.

*comment on "worst days."*

TR 589 (emphasis added). In view of the ALJ's obligation to develop the record concerning

Plaintiff's mental impairments, and particularly in view of the remand, the ALJ should not have

simply accepted this statement. It was incumbent upon the ALJ, and indirectly upon Dr.

Jasnowitz, to pursue what occurred on Plaintiff's "worst days," how often those days occurred,

etc.

Fourth, the ALJ's "finding," discussed above, is not supported by substantial evidence.

In his finding, the ALJ stated in part, "The claimant has mild restrictions in his activities of daily

living, no limitations in maintaining social functioning, mild to moderate difficulties in

maintaining concentration, persistence, or pace, and no episodes of decompensation that were of

extended duration." TR 33. Dr. Jasnowitz's evaluation, however, concludes that Plaintiff was

"moderately limited" in his "ability to understand and remember," in his "sustained

concentration and persistence," and in his "ability to adapt/tolerate stress associated with day to

day activity." TR 591. Her evaluation also found that Plaintiff was "not significantly limited" in

"social interaction." *Id.* The specific language used by the ALJ in his finding does not

correspond to the language used by Dr. Jasnowitz in her evaluation, and the ALJ does not

explain the factual bases underlying his finding.[36]

Fifth, as discussed above, the VE essentially testified that, using the definition of "fair"

set forth in Dr. Jasnowitz's Medical Source Statement, Plaintiff would not be able to sustain full

---

[36]The ALJ's finding is, likewise, not supported by the assessment of Dr. Sarsati. *See* TR
597-597. To the extent that the finding is supported by the previous examinations of Dr.
Doineau, Dr. Pestrak, Dr. Threalkill, Dr. Lane, or Dr. Yearick, the ALJ could not have relied
solely on those reports, which the Appeals Council had already determined were inadequate as
evaluations of Plaintiff's mental impairments.

time employment.  TR 99-100.  The ALJ apparently discounted this testimony in view of his conclusion that the term "fair" was poorly defined.  For the reasons discussed above, however, he should not have done so.

Finally, the ALJ's rejection of Dr. Sarsati's conclusions, particularly her GAF score of 35/45, is not adequately explained.  The ALJ does not specify which symptoms Plaintiff reported to Dr. Sarsati that he did not report to Dr. Jasnowitz, nor does he explain which statements Plaintiff made to Dr. Sarsati that were contradictory to those he made to "other psychologists." The ALJ also apparently referred to Dr. Sarsati as a "psychologist," when she is in fact a medical doctor.  The ALJ's rejection of Dr. Sarsati's evaluation because it lasted only 45 minutes (as compared to Dr. Jasnowitz's examination of 2 hours 45 minutes) seems completely arbitrary. Presumably, consistent with her professional obligations, Dr. Sarsati would not have provided a written assessment of Plaintiff that was based on too short an interview with him.

For these reasons, the Court cannot determine, based on the record, whether there is substantial evidence that Plaintiff is not mentally impaired, and remand is appropriate.

## IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that the Commissioner's decision be REMANDED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific

68

objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

E. CLIFTON KNOWLES
United States Magistrate Judge

Case 3:02-cv-01007   Document 21   Filed 08/02/05   Page 69 of 69 PageID #: 69